# SCHNEIDER *v.* SMITH, COMMANDANT, UNITED STATES COAST GUARD.

No. 196.   Argued December 12–13, 1967.—
Decided January 16, 1968.

18

*Leonard W. Schroeter* and *John Caughlan* argued the cause and filed a brief for appellant.

*John S. Martin, Jr.,* argued the cause for appellee. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Yeagley, Kevin T. Maroney* and *Lee B. Anderson.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Appellant, who has served on board American-flag commercial vessels in various capacities, is now qualified to act as a second assistant engineer on steam vessels. But between 1949 and 1964 he was employed in trades other than that of a merchant seaman. In October 1964 he applied to the Commandant of the Coast Guard for a validation of the permit or license which evidences his ability to act as a second assistant engineer.

Under the Magnuson Act, 64 Stat. 427, 50 U. S. C. § 191 (b), the President is authorized, if he finds that "the security of the United States is endangered by . . . subversive activity," to issue rules and regulations "to safeguard against destruction, loss, or injury from sabotage or other subversive acts" all "vessels" in the territories or waters subject to the jurisdiction of the United States.[1]

---

[1] Section 191 provides in part:

"Whenever the President finds that the security of the United States is endangered by reason of actual or threatened war, or invasion, or insurrection, or subversive activity, or of disturbances or threatened disturbances of the international relations of the United States, the President is authorized to institute such measures and issue such rules and regulations—

"(a) to govern the anchorage and movement of any foreign-flag vessels in the territorial waters of the United States, to inspect such vessels at any time, to place guards thereon, and, if necessary in his

President Truman promulgated Regulations, 33 CFR, pt. 6, which give the Commandant of the Coast Guard authority to grant or withhold validation of any permit or license evidencing the right of a seaman to serve on a merchant vessel of the United States. § 6.10–3. He is directed not to issue such validation unless he is satisfied that "the character and habits of life of such person are such as to authorize the belief that the presence of the individual on board would not be inimical to the security of the United States." § 6.10–1.

The questionnaire, which appellant in his application was required to submit, contained the following inquiry which he answered:

"ITEM 4. Do you now advocate, or have you ever advocated, the overthrow or alteration of the Government of the United States by force or violence or by unconstitutional means?

"Answer: No."

The questionnaire contained the following inquiries which related to his membership and participation in organizations which were on the special list of the Attorney General as authorized by Executive Order 10450, 18 Fed. Reg. 2489:

"ITEM 5. Have you ever submitted material for publication to any of the organizations listed in Item 6 below?

---

opinion in order to secure such vessels from damage or injury, or to prevent damage or injury to any harbor or waters of the United States, or to secure the observance of rights and obligations of the United States, may take for such purposes full possession and control of such vessels and remove therefrom the officers and crew thereof, and all other persons not especially authorized by him to go or remain on board thereof;

"(b) to safeguard against destruction, loss, or injury from sabotage or other subversive acts, accidents, or other causes of similar nature, vessels, harbors, ports, and waterfront facilities in the United States, the Canal Zone, and all territory and water, continental or insular, subject to the jurisdiction of the United States."

"Answer. No.

"ITEM 6. Are you now, or have you ever been, a member of, or affiliated or associated with in any way, any of the organizations set forth below? [There followed a list of more than 250 organizations.]

"Answer. Yes.

"If your answer is 'yes,' give full details in Item 7.

"ITEM 7. (Use this space to explain Items 1 through 6. . . . Attach a separate sheet if there is not enough space here.)

"Answer. I have been a member of many political & social organizations, including several named on this list.

"I cannot remember the names of most of them & could not be specific about any.

"To the best of my knowledge, I have not been a member or participated in the activities of any of these organizations for ten years."

Upon receiving the questionnaire returned by the appellant, the Commandant advised him that the information was not sufficient and that answers to further interrogatories were necessary.[2]

---

[2] "1. With respect to your statements above, furnish the following information, fully and honestly to the best of your ability:

"(a) List the names of the political and social organizations to which you belonged, and location.

"(b) Furnish approximate dates of membership.

"(c) Furnish full particulars concerning the extent of your activities and participation in the organizations (number and type of meetings/functions attended; positions or offices held; classes or schools attended; contributions made; etc.).

"(d) Your reason for discontinuing the membership.

"(e) Your present attitude toward the principles and objectives of the organizations.

"If your answer is 'YES' to the following Questions, *explain fully* in the space provided at the end of the Interrogatories:

"2. Are you now, or have you ever been, a member of or affiliated

In reply, appellant, speaking through his counsel, admitted to the Commandant that he had been a member of the Communist Party as well as other organizations on the Attorney General's list and that he had subscribed to People's World. He said that he had joined the Party because of his personal philosophy and idealistic goals, but later quit it and the other organizations due to fundamental disagreement with Communist methods and techniques. But beyond that he said he would not answer because "it would be obnoxious to a truly free citizen to answer the kinds of questions under compulsion that you require." The Commandant declined to process the application further, relying upon 33 CFR § 121.05 (d)(2), which authorizes him to hold the application in abeyance if an applicant fails or refuses to furnish the additional information.

Appellant thereupon brought this action for declaratory relief that the provisions of the Magnuson Act in question and the Commandant's actions thereunder were unconstitutional, praying that the Commandant be directed to approve his application and that he be enjoined

---

with, in any way, the Communist Party, its Subdivisions, Subsidiaries, or Affiliates?

" .....................
(Answer 'Yes' or 'No.')

"3. Have you at any time been a subscriber to the 'People's World'?

" ..................... If your answer is 'Yes,' give dates.
(Answer 'Yes' or 'No.')

4. "Have you at any time engaged in any activities in behalf of the 'People's World'?  .......................
(Answer 'Yes' or 'No.')

"If your answer is 'Yes,' furnish details.

"5. What is your present attitude toward the Communist Party?

"6. What is your present attitude toward the principles and objectives of Communism?

"7. What is your attitude toward the form of Government in the United States?"

from interfering with appellant's employment upon vessels flying the American flag.

A three-judge court was convened and the complaint was dismissed. 263 F. Supp. 496. The case is here on appeal, 28 U. S. C. § 1253. We postponed the question of jurisdiction to the merits. 389 U. S. 810.

We agree, as does appellee, that the case was one to be heard by a three-judge court and that accordingly we have jurisdiction of this appeal. For appellant did raise the question as to whether the statute was unconstitutional because of vagueness and abridgment of First Amendment rights and also questioned whether the power to install a screening program was validly delegated. A three-judge court was accordingly proper. *Baggett* v. *Bullitt,* 377 U. S. 360; *Zemel* v. *Rusk,* 381 U. S. 1.

The Magnuson Act gives the President no express authority to set up a screening program for personnel on merchant vessels of the United States. As respects "any foreign-flag vessels" the power to control those who "go or remain on board" is clear. 50 U. S. C. § 191 (a). As respects personnel of our own merchant ships, the power exists under the Act only if it is found in the power to "safeguard" vessels and waterfront facilities against "sabotage or other subversive acts," that is, under § 191 (b). The Solicitor General argues that the power to exclude persons from vessels "clearly implies authority to establish a screening procedure for determining who shall be allowed on board." But that power to exclude is contained in § 191 (a) which, as noted, applies to "foreign-flag vessels," while, as we have said, the issue tendered here must find footing in § 191 (b).[3]

---

[3] It is true that Senator Magnuson when discussing this measure stated that it "will give the President the authority to invoke the same kind of security measures which were invoked in World War I and in World War II." 96 Cong. Rec. 10795. And from that the

We agree with the District Court that keeping our merchant marine free of saboteurs is within the purview of this Act. Our question is a much narrower one.

The Regulations prescribe the standards by which the Commandant is to judge the "character and habits of life" of the employee to determine whether his "presence . . . on board" the vessel would be "inimical to the security of the United States":

> "(a) Advocacy of the overthrow or alteration of the Government of the United States by unconstitutional means.
>
> "(b) Commission of, or attempts or preparations to commit, an act of espionage, sabotage, sedition or treason, or conspiring with, or aiding or abetting another to commit such an act.

Solicitor General argues that the Act authorizes the broad sweeping personnel screening programs which were in force during World War II.

But this reference by Senator Magnuson apparently was to § 191 (a) which, as noted, covers "any foreign-flag vessels." When it came to § 191 (b) Senator Magnuson did not speak in terms of any screening program, but said:

"It [the bill] also has this purpose, which I think is a good one: As I have said before, the last stronghold of subversive activity in this country, in my opinion, or at least the last concentrated stronghold, has been around our waterfronts. It would be impossible for destruction to come to any great port of the United States, of which there are many, as the result of a ship coming into port with an atomic bomb or with biological or other destructive agency, without some liaison ashore. This would give authority to the President to instruct the FBI, in cooperation with the Coast Guard, the Navy, or any other appropriate governmental agency, to go to our water fronts and pick out people who might be subversives or security risks to this country. I think it goes a long way toward taking care of the domestic situation, as related to this subject, particularly in view of the large amount of talk we have had in the Senate within the past few days about Communists. The bill also protects that last loophole which is left, by which there might be some actual destruction along the shores of the United States." 96 Cong. Rec. 11321.

"(c) Performing, or attempting to perform, duties or otherwise acting so as to serve the interests of another government to the detriment of the United States.

"(d) Deliberate unauthorized disclosure of classified defense information.

"(e) Membership in, or affiliation or sympathetic association with, any foreign or domestic organization, association, movement, group, or combination of persons designated by the Attorney General pursuant to Executive Order 10450, as amended." 33 CFR § 121.03.

If we assume *arguendo* that the Act authorizes a type of screening program directed at "membership" or "sympathetic association," the problem raised by it and the Regulations would be kin to the one presented in *Shelton* v. *Tucker,* 364 U. S. 479, where a teacher to be hired by a public school of Arkansas had to submit an affidavit "listing all organizations to which he at the time belongs and to which he has belonged during the past five years." *Id.,* at 481.

We held that an Act touching on First Amendment rights must be narrowly drawn so that the precise evil is exposed; that an unlimited and indiscriminate search of the employee's past which interferes with his associational freedom is unconstitutional. *Id.,* at 487–490.

If we gave § 191 (b) the broad construction the Solicitor General urges, we would face here the kind of issue present in *Shelton* v. *Tucker, supra,* whether government can probe the reading habits, political philosophy, beliefs, and attitudes on social and economic issues of prospective seamen on our merchant vessels.

A saboteur on a merchant vessel may, of course, be dangerous. But no charge that appellant was a saboteur

was made. Indeed, no conduct of appellant was at issue before the Commandant. The propositions tendered in the complaint were (1) plaintiff is now and always has been loyal to the United States; (2) he has not been active in any organization on the Attorney General's list for the past 10 years; (3) he has never committed any act of sabotage or espionage or any act inimical to the security of the United States. Those propositions were neither contested by the Commandant nor conceded. He took the position that admission of evidence on those propositions was "irrelevant and immaterial."

We are loath to conclude that Congress, in its grant of authority to the President to "safeguard" vessels and waterfront facilities from "sabotage or other subversive acts," undertook to reach into the First Amendment area. The provision of the Act in question, 50 U. S. C. § 191 (b), speaks only in terms of actions, not ideas or beliefs or reading habits or social, educational, or political associations.

The purpose of the Constitution and Bill of Rights, unlike more recent models promoting a welfare state, was to take government off the backs of people. The First Amendment's ban against Congress "abridging" freedom of speech, the right peaceably to assemble and to petition, and the "associational freedom" (*Shelton* v. *Tucker, supra,* at 490) that goes with those rights create a preserve where the views of the individual are made inviolate. This is the philosophy of Jefferson that "the opinions of men are not the object of civil government, nor under its jurisdiction . . . . [I]t is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order . . . ." [4]

---

[4] A Bill for Establishing Religious Freedom, Jeffersonian Cyclopedia 976 (1900).

No act of sabotage or espionage or any act inimical to the security of the United States is raised or charged in the present case.

In *United States* v. *Rumely,* 345 U. S. 41, the Court construed the statutory word "lobbying" to include only direct representation to Congress, its members, and its committees, not all activities tending to influence, encourage, promote, or retard legislation. *Id.,* at 47. Such an interpretation of the statute, it was said, was "in the candid service of avoiding a serious constitutional doubt" (*ibid.*)—doubts that were serious "in view of the prohibition of the First Amendment." *Id.,* at 46.

The holding in *Rumely* was not novel. It is part of the stream of authority which admonishes courts to construe statutes narrowly so as to avoid constitutional questions.[5]

The Court said in *Rumely,* "Whenever constitutional limits upon the investigative power of Congress have to be drawn by this Court, it ought only to be done after Congress has demonstrated its full awareness of what is at stake by unequivocally authorizing an inquiry of dubious limits. Experience admonishes us to tread warily in this domain." 345 U. S., at 46.

The present case involves investigation, not by Congress but by the Executive Branch, stemming from congressional delegation. When we read that delegation with an eye to First Amendment problems, we hesitate to conclude that Congress told the Executive to ferret out the ideological strays in the maritime industry. The words it used—"to safeguard . . . from sabotage or other subversive acts"—refer to actions, not to ideas or

---

[5] *United States* v. *Delaware & H. Co.,* 213 U. S. 366, 407–408; *United States* v. *Harriss,* 347 U. S. 612, 618, n. 6; *International Machinists* v. *Street,* 367 U. S. 740, 749; *Lynch* v. *Overholser,* 369 U. S. 705, 710–711; *United States* v. *National Dairy Corp.,* 372 U. S. 29, 32.

beliefs. We would have to stretch those words beyond their normal meaning to give them the meaning the Solicitor General urges. *Rumely,* and its allied cases, teach just the opposite—that statutory words are to be read narrowly so as to avoid questions concerning the "associational freedom" that *Shelton* v. *Tucker* protected and concerning other rights within the purview of the First Amendment.

*Reversed.*

Mr. Justice Black, while concurring in the Court's judgment and opinion, also agrees with the statement in Mr. Justice Fortas' concurring opinion that the statute under consideration, if construed to authorize the interrogatories involved, is offensive to the First Amendment.

Mr. Justice Marshall took no part in the consideration or decision of this case.

Mr. Justice Fortas, concurring.

I concur in the opinion of the Court. Reversal is dictated because the interrogatories which petitioner refused to answer offend the First Amendment. *Shelton* v. *Tucker,* 364 U. S. 479· (1960). (They also pass the outermost bounds of reason. No agency may be permitted to require of a person, subject to heavy penalty, sworn essays as to his "attitude toward the form of Government in the United States" or "full particulars," under oath, without time limit, as to contributions made and functions attended with respect to 250 organizations.) I agree that since Congress did not specifically authorize a personnel screening program, authority to impose procedures of the comprehensive type here involved, necessarily impinging on First Amendment freedoms, may not be inferred from dubious general language. The fault, however, is not that there was an inadequate or

improper delegation, but that Congress did not authorize the type of investigation which was launched. Needless to say, Congress has constitutional power to authorize an appropriate personnel screening program and to delegate to executive officials the power to implement and administer it. See *United States* v. *Robel,* 389 U. S. 258 (1967).

MR. JUSTICE STEWART, agreeing with the separate views of MR. JUSTICE FORTAS, concurs in the judgment.

MR. JUSTICE WHITE, with whom MR. JUSTICE HARLAN joins, concurring in the result.

I agree with the Court that the Magnuson Act did not authorize the inquiry undertaken by the Coast Guard Commandant and that therefore the judgment of the District Court must be reversed. I express no opinion as to the scope of inquiry which Congress could constitutionally provide with respect to applicants for the position of merchant seaman.