106 N.J. Super. 545 (1969)
256 A.2d 298
DENISE ANDERSON, WILLIAM ANDERSON, ROBERT W. CASTLE, ARLENE LATKO, JOEL MYRON, ADRIAN TENHOR AND JERSEY CITY BRANCH OF NAACP, INDIVIDUALLY AND ON BEHALF OF THOSE PERSONS AND ORGANIZATIONS SIMILARLY SITUATED, PLAINTIFFS,
v.
ARTHUR J. SILLS, ATTORNEY GENERAL OF NEW JERSEY, STEVEN NESTOR, POLICE CHIEF OF JERSEY CITY, GEORGE N. BONELLI, SHERIFF OF HUDSON COUNTY AND GEORGE WHELAN, POLICE DIRECTOR OF JERSEY CITY, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AND AS REPRESENTATIVES OF THE CLASS OF POLICE CHIEFS, COUNTY SHERIFFS, MUNICIPAL, COUNTY AND STATE LAW ENFORCEMENT OFFICIALS OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
July 30, 1969.
*547 Mr. Morris Stern for plaintiffs (Mr. Morris Stern, Mr. L. Walter Finch, Mrs. Muriel Finch, Mr. Frank Askin and Mr. Arthur D'Italia on the brief; Mr. Stephen M. Nagler, Mr. Melvin Wulf and Mrs. Eleanor Norton of American Civil Liberties Union, of counsel).
Mr. Joseph A. Hoffman, First Assistant Attorney General, for defendant Arthur J. Sills (Mr. Stephen Skillman, Deputy Attorney General, on the brief; Mr. Arthur J. Sills, Attorney General, attorney).
Mr. James F. Ryan, Corporation Counsel of Jersey City, for defendants Steven Nestor and George Whelan.
Mr. Daniel F. Gilmore, Assistant County Counsel for Hudson County, for defendant George N. Bonelli (Mr. William F. Kelly, Jr., Hudson County Counsel, attorney).
MATTHEWS, J.S.C.
Plaintiffs are adult citizens and a civil rights organization of Hudson County. They have instituted this action seeking a declaratory judgment that the use of a reporting system by local and county officials to gather and compile information relating to potential and actual civil disorders violates the United States Constitution. They also seek injunctive relief against the continuance of such reporting system and for the termination thereof.
On or about April 23, 1968 defendant Attorney General Sills distributed a memorandum entitled "Civil Disorders  the Role of Local, County and State Government" to municipal and county officials within New Jersey. A letter accompanying the memorandum, signed by the Attorney General, indicated that it was being distributed pursuant to *548 a conference held between Governor Hughes and the mayors of various municipalities of the State on April 16, 1968.
The memorandum deals with many aspects of the problem of civil disorder, including methods of advance planning, mutual assistance between municipalities, summoning assistance from State Police and National Guard, legal steps to be taken in proclaiming an emergency, and the control of false rumors which may escalate a civil disorder.
Plaintiffs here seek review of and relief from only a small segment of the 43-page memorandum. The matter at issue is contained in a portion of the memorandum, printed on page 19 thereof, which is entitled "Potential Problems" and which reads as follows:
"Our State Police have been working closely with local police in various communities throughout the State in a continuing effort to keep abreast of potential civil disorder problems. In that respect, therefore, we are already familiar generally with basic problems in these communities. However, these problems change and we should never become over confident to the end that we lose sight of the cause, as well as the effect of civil disturbances. The State Police Central Security Unit has distributed Security Summary Reports (Form 421) and Security Incident Reports (Form 420) (see Appendix G) to each police department. It is necessary that these reports be used routinely to inform the State Police of the situation in your community. We urge you to see that this vital intelligence is communicated to this central bureau for evaluation and dissemination."
Forms 420 and 421, mentioned in the memorandum, along with instructions for their preparation, are reproduced as Appendices A and B, respectively, to this opinion.
Form 420, the Security Incident Report Form, refers in paragraph 9 to a civil disturbance, riot, rally, protest, demonstration, march and confrontation as being illustrative of incidents which are urged to be reported. Paragraphs 4 through 6 indicate that anticipated incidents, incidents still in progress and completed incidents all fall within the scope of the reporting system. The report is designed to determine the names of organizations or groups involved, leaders, the type of organization and the nature of the incident. It also *549 requests the reporting authority to identify the source of information concerning the incident. Form 421, the Security Summary Report, is designed to obtain information concerning individuals who may be connected with potential civil disorder problems. Various information is solicited concerning the subject of Form 421 report and also the sources of information.
Generally, plaintiffs submit that the intelligence system urged by the Attorney General is so broad and sweeping that any gathering or event could qualify for a write-up, entry of a report into central State files, evaluation and dissemination. Broadly, they urge that this system, considering its scope, can only have a deterring effect on the exercise of First Amendment rights not only by them but also by all citizens.
This matter is presently before the court on a motion by the Attorney General to dismiss the complaint as failing to state a cause of action. Plaintiffs have answered this motion by moving for summary judgment. Concededly, there are no relevant issues of fact which must be determined by the court.
The first issue raised by the Attorney General on his motion is that the complaint does not allege facts indicating that any of the plaintiffs has been aggrieved by the intelligence reporting system challenged herein. Since it is contended that none of the plaintiffs has demonstrated or indicated that they have been aggrieved in any way by the intelligence reporting system, their standing to press the constitutional claims made in the complaint are challenged. The Attorney General further alleges that the failure to allege facts which would confer standing on any of the plaintiffs represents something more than a mere technical defect in pleading; he questions whether anyone would genuinely be deterred from exercising First Amendment rights because of the knowledge of the existence of the State Police intelligence system; he urges that the vital role that this intelligence system plays in the affairs of the State *550 should require this court to adhere strictly to the doctrine of standing and only entertain an action by someone who can particularize the manner in which he has been harmed.
I believe that the Attorney General has oversimplified the problem. This is an action for declaratory judgment under N.J.S. 2A:16-50 et seq. Decisions of our courts have indicated that one need not wait until he has been found to violate the law before seeking judicial relief as to the applicability of statutes. See State v. Baird, 50 N.J. 376 (1967); Sanitary Vendors, Inc. v. Byrne, 40 N.J. 157 (1963); Lucky Calendar Co. v. Cohen, 19 N.J. 399 (1955). In the area of constitutional litigation the United States Supreme Court has in recent decisions shown a marked relaxation of standards of justiciability where governmental action inhibits the exercise of First Amendment rights. See, e.g., Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); and, further, see the decision of a three-judge federal court in Straut v. Calissi, 293 F. Supp. 1339 (D.N.J. 1968). Compare Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).
In Straut v. Calissi, three members of a peace movement sought a declaration of unconstitutionality of a dormant sedition statute (N.J.S. 2A:148-22) which had been cited in a speech by defendant county prosecutor as a potential weapon against "peaceniks." None of the plaintiffs was personally threatened with prosecution. Judge Forman, in writing the opinion of the court, stated:
"The importance of the constitutional right here being asserted, however, overrides the substantiality or insubstantiality of the threats in this case. * * * Where, as here, suit is brought by plaintiffs whose activities apparently fall within the statute's broad inhibitions, federal jurisdiction exists." (at pp. 1342-1343; emphasis added)
This court observes that plaintiff Anderson has been involved in a "sit-in" at St. Peter's College, Jersey City, and that *551 she was a defendant in litigation subsequently instituted by the college in this court. Plaintiff Castle is well-known throughout Hudson County for his civil rights activities, and the court takes notice of such activities.
Under the federal cases the concepts of standing in First Amendment cases have had the effect of constituting individual litigants quasi-attorneys general for large classes of citizens whose rights might otherwise be oppressed. I have no difficulty in accepting the standing of plaintiffs to maintain this action. The question of standing as posed, however, is related to the substantive question as to whether the State Police intelligence gathering system results in a denial of constitutional rights. The answer to this question must be resolved by turning to plaintiffs' motion for summary judgment.
The State urges that the public purpose of the State Police intelligence gathering system is apparent from an examination of the memorandum in which it is presented. The Attorney General points out that in the last four years one civil disorder after another has occurred in cities of the United States; hundreds of citizens have been killed and hundreds of millions of dollars in property have been destroyed. It is pointed out that in the summer of 1967, serious civil disorders broke out in this State in Newark and Plainfield, and that less serious disorders broke out in many other cities. Following the trouble occurring in the summer of 1967, Governor Hughes and President Johnson both appointed select commissions to study the causes of the disorders and to make recommendations. Both commissions submitted reports calling for massive programs to deal with the root problems of unrest in the black ghettos in big cities. The reports also recommended that careful planning be conducted, first, to prevent the outbreak of future disorders and, second, to minimize the effect of disorders as they occur. The Attorney General further informs us that the President's Commission specifically directed its attention *552 to the role of police intelligence in preventing civil disorders, and quotes from a supplement to the Commission's report:
"Intelligence  The absence of accurate information both before and during a disorder has created special control problems for police. Police departments must develop means to obtain adequate intelligence for planning purposes, as well as on-the-scene information for use in police operations during a disorder.
An intelligence unit staffed with full-time personnel should be established to gather, evaluate, analyze, and disseminate information on potential as well as actual civil disorders. It should provide police administrators and commanders with reliable information essential for assessment and decision-making. It should use undercover police personnel and informants but it should also draw on community leaders, agencies, and organizations in the ghetto." Report of the National Advisory Commission on Civil Disorders, at p. 487 (1968).
The inference to be drawn is that the State Police intelligence reporting system was created, if not in compliance with the Commission's Report, at least by following its suggestion.
This court is not unmindful of the concern of the Governor, the Legislature and the Attorney General over the danger to life and property presented by the advent of civil disorders and riots. Neither is it unaware of the obligation cast upon the Executive and Legislative Branches of the State Government to protect the life and property of all the citizens of the State. It may be conceded that the objects of the actions of the Attorney General taken here are well within the established police power of the State. However, when a state official, in exercising his powers, comes in conflict with those individual liberties protected by the Bill of Rights, it is the delicate and difficult task of the courts to determine whether the resulting restriction on freedom can be tolerated. See Schneider v. New Jersey, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939).
Form 421, the Security Summary Report, requests local police or law enforcement officials to include basic personal data on the subject of the report, such as date and place of *553 birth, marital status, name of spouse, age, race, physical description, occupation and employer, motor vehicle record, as well as names and addresses of associates, and a narrative which should include, according to instructions, among other items, citizenship, habits or traits, places frequented, financial status, and past activities, findings and/or observations. There is no indication or inference to be drawn that the purpose of the Attorney General in obtaining such information is to stop people from expressing political views. Clearly, his aim is to prevent civil disorders and apprehend perpetrators thereof. The civil disorders memorandum prepared by the Attorney General makes it apparent that he believes there is a relationship between individuals and organizations who engage in protest demonstrations, and the civil disorders which are the object of his concern. He does not, however, in any manner, make clear in the memorandum how the gathering of the data called for in Form 421 will be helpful in preventing civil disorders. It may very well be that some protestors and their activities have had some relationship to some unlawful occurrences, but what can be the effect of the knowledge of the existence of such an intelligence gathering system upon those of our fellow citizens who have the desire and the right to demonstrate both physically and vocally in a lawful manner their opposition to governmental policy or political activity?
Over the past decade the Supreme Court of the United States has significantly developed the content and meaning of First Amendment rights and the availability of remedies for infringement thereof. If any case is to be singled out as being a landmark in this development it is Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). There, threatened state criminal proceedings were enjoined, despite the traditional federal abstention doctrine and the burden of proof required to obtain injunctive relief. The court found that as long as the statute under which the criminal proceedings were threatened existed, the threat of prosecutions of protected areas of expression was a real *554 and substantial one. It found that even the prospect of ultimate failure of such prosecutions did not serve to dispel their chilling effect on protected expression.
In Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), the court struck down a governmental scheme which required addressees of foreign communist propaganda to return a reply card if they wanted such material delivered by the Post Office Department. In doing so, the court made it clear that it was not the minimal burden of returning the card that was at fault, but that this requirement was "almost certain to have a deterrent effect, especially as respects those who have sensitive positions." (At p. 307, 85 S.Ct., at p. 1496) To the same effect is NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), which found the challenged Virginia regulation invalid because its mere existence might deter the exercise of delicate and valuable First Amendment rights.
The constitutional doctrine which is found as a common thread in the cases just cited rests on the premise that First Amendment rights are of transcendental value to all society and not merely to those exercising their rights. Dombrowski v. Pfister, supra. Thus, the injury to be remedied is considered not only personal but also as one affecting society as well. Such injury must be measured by the impact the given inhibitory regulation, law, or official act may have on those who will not complain because of the chilling effect that even that action might have on their otherwise absolute right to do so. Of course, whether a given regulation, law or official act will have a chilling effect on the First Amendment rights of an individual probably cannot be proved in any objective, measurable manner in any given case. Accordingly, I believe that the constitutional doctrine requires that we consider any burden placed upon First Amendment rights that might reasonably be expected to interfere or to prevent their exercise as constituting an impermissible infringement on those rights. See Dombrowski v. Pfister, And Lamont v. Postmaster General, supra.
*555 It is apparent, therefore, that where First Amendment rights are involved, mere judicial recognition of the legitimacy of govermental goals in controlling unprotected and illegal conduct cannot be sufficient to support any given regulation, law or official act. Nor should it be the task of the judiciary to balance governmental need against First Amendment rights when the regulation, law or official act goes beyond areas reasonably necessary to reach the permissible governmental goal, and thereby inhibits the rights of persons who otherwise would not be affected by more narrow efforts on the part of the government to control unlawful conduct. See United States v. Robel, 389 U.S. 258, 266, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). Robel involved a federal statute making it a crime for communists to work in designated defense plants, once they had knowledge that they were members of an organization designated as communistic by the Subversive Activities Control Board. In holding the statute unconstitutional, the court recognized that the purpose of the statute involved a legitimate governmental interest in protecting against sabotage in defense facilities; nevertheless, the court said:
"* * * It is not our function to examine the validity of that congressional judgment. Neither is it our function to determine whether an industrial security screening program exhausts the possible alternatives to the statute under review. We are concerned solely with determining whether the statute before us has exceeded the bounds imposed by the Constitution when First Amendment rights are at stake. The task of writing legislation which will stay within those bounds has been committed to Congress. Our decision today simply recognizes that, when legitimate legislative concerns are expressed in a statute which imposes a substantial burden on protected First Amendment activities, Congress must achieve its goal by means which have a `less drastic' impact on the continued vitality of First Amendment freedoms. * * * The Constitution and the basic position of First Amendment rights in our democratic fabric demand nothing less." (At pp. 267-268, 88 S.Ct. at 425)
In Robel the court refused to balance the obviously legitimate governmental interest against First Amendment rights. Instead, *556 it confined its analysis to whether Congress had adopted constitutional means in achieving its concededly legitimate legislative goal. Consequently, the court held only that the congressional power and individual rights be accommodated by legislation drawn more narrowly to avoid the conflict. 389 U.S., at p. 268, 88 S.Ct. 419.
The related constitutional concepts of vagueness and overbreadth have been established in many decisions of the United States Supreme Court. Pertinent citations, in addition to Robel, include Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); Keyishian v. Board of Regents of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Lamont v. Postmaster General, and Dombrowski v. Pfister, supra. Consideration should also be given to the decisions of the three-judge panels in Straut v. Calissi, supra, and Heilberg v. Fixa, 236 F. Supp. 405 (N.D. Cal. 1964).
I find that the directive in question, and Forms 420 and 421 as used therewith, are violative of the First Amendment of the United States Constitution in that they overreach in their attempt to achieve what is probably a legitimate governmental goal. At the risk of oversimplification, it is not too difficult to imagine the reluctance of an individual to participate in any kind of protected conduct which seeks publicly to express a particular or unpopular political or social view because of the fact that by doing so he might now have a record, or because his wife, his family or his employer might also be included in the data bank created by the State through the forms in question. While it might be argued that the directive, and the forms accompanying it, relate only to mass type action conduct, and not to anyone who expresses a radical, political or social opinion  or that the directive and its forms are not concerned with the content of expression, but rather with the preservation of public order and, therefore, only an indirect infringement of speech  such arguments are refuted by the all encompassing *557 nature of the content of the two forms in question. The Security Summary Report (Form 421) in not restricted to something that a law enforcement officer would normally consider an improper incident. The form is related to people and not to activities, and the probability that it will be interpreted by some as requesting investigations of political troublemakers is too apparent. What, for example, is to prevent a report being rendered on one who opposes an existing political regime in a city, county or the state. In addition, insofar as the procedures would inhibit freedom of association, they are clearly impermissible. See NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The exercise of power which deters individuals from exercising First Amendment rights is denied to government. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Lamont v. Postmaster General, supra.
I conclude that plaintiffs' complaint, that they do not want to be investigated and the subject of central surveillance as potential problems, bears merit. The far-reaching nature of the forms in question, together with the apparent lack of standards for the use thereof, indicates strongly that plaintiffs and others may well be subjected to abuse as a result of this intelligence system. The secret files that would be maintained as a result of this intelligence gathering system are inherently dangerous and by their very existence tend to restrict those who would advocate, within the protected areas, social and political change. Accordingly, I determine that a judgment should be entered declaring that the completion, maintenance and distribution of Forms 420 and 421, under the directive aforementioned, is violative of the First Amendment to the Constitution of the United States. Further, that the Attorney General be directed to issue a communication rescinding the directive aforementioned and the use of Forms 420 and 421 thereunder. Finally, that the Attorney *558 General produce and destroy all forms and files connected therewith, and any other information concerning the activities of plaintiffs and others similarly situated, collected under the directive aforementioned, except where such information will be used to charge persons with specifically defined criminal conduct.
No costs to any party.

APPENDIX A
INSTRUCTIONS FOR PREPARING THE SECURITY INCIDENT REPORT, SP FORM 420, AND CONTINUATION PAGE, SP FORM 420 A.
The numbers on the Security Incident Report, SP Form 420 and continuation page, SP Form 420A, have been inserted to simplify filling out the report. They correspond with the following numbers and titles:
1. DEPARTMENT OR AGENCY  Enter Department or Agency reporting.
2. CASE NUMBER  Type Case Number, if applicable.
3. REFERENCE NUMBER  Leave Blank.
4. ANTICIPATED INCIDENT  Check box if reporting an anticipated incident.
5. INCIDENT IN PROGRESS  If reporting on an incident still in progress, check box.
6. INCIDENT COMPLETED  Check box if reporting an incident that has occurred.
7. DATE OR DATES  Enter date of incident. Use numbers for month, day and year. If incident is anticipated, include expected date. In reporting incident spanning several days, list date started and date ended.
EXAMPLE: 8-4-68 to 8-7-68
8. TIME  If the exact time of the incident is known, type the time. Use "AM" and "PM". In reporting incident *559 covering several hours, list time started and time completed.
EXAMPLE: 10:00 A.M. to 2:00 P.M.
9. TYPE OF INCIDENT  Enter the type of incident.
EXAMPLES: Civil disturbance, riot, rally, protest, demonstration, march, confrontation, etc.
10. LOCATION  Type the location of the incident. If business or residence, the number and name of street, road, lane or avenue. If open area, give approximate distance to a known geopraphic location.
11. REASON OR PURPOSE OF INCIDENT  Enter reason for incident or alleged purpose.
12. NUMBER OF PARTICIPANTS  List estimated or announced number of participants or anticipated participants.
13. ORGANIZATIONS AND/OR GROUPS INVOLVED  Give full names and addresses of organizations and/or groups involved. If more space is needed, use Narrative.
14. LEADERS  Enter names, addresses and titles, if any, of leaders of organizations and/or groups involved. Include nicknames, aliases, and other identifying data.
15. EVALUATION OF SOURCE  Evaluate the source by checking the box which most nearly describes the informant:
 Completely Reliable
 Fairly Reliable
 Unreliable
 Reliability Unknown
16. EVALUATION OF INFORMATION  Evaluate information by checking the box which most nearly describes the contents:
 Confirmed by Other Source
 Possibly True
*560
 Improbable
 Cannot be Judged
17. NARRATIVE
a. Information previously included elsewhere on this report need not be repeated in the Narrative.
b. If an organization and/or group is involved in the incident reported, include type and how involved.
 EXAMPLES OF TYPES: Left wing, Right wing,
 Civil Rights, Militant,
 Nationalistic,
 Pacifist, Religious,
 Black Power, Ku Klux
 Klan, Extremist, etc.
 EXAMPLES OF HOW INVOLVED: Sponsor,
 co-sponsor,
 supporter,
 assembled group,
 etc.
c. Use this section to furnish additional information.
d. If additional space is required, use Continuation Page, SP Form 420A.
18. REPORTING DATE  Type date this report was prepared using numbers for month, day and year.
19. NAME  Type rank and name in block. (Sign above block)
20. BADGE NUMBER  Type badge number in block, if any.
21. PAGE OF PAGES  May be filled in with ball point pen when report is completed.
*561 
*562 

APPENDIX B
INSTRUCTIONS FOR PREPARING THE SECURITY SUMMARY REPORT, SP FORM 421.
The numbers on the Security Summary report, SP Form 421, have been inserted to simplify filling out the report. They correspond with the following numbers and titles:

*563 1. DEPARTMENT OR AGENCY  Department or agency reporting
2. CASE NUMBER  Type Case Number, if applicable.
3. REFERENCE NUMBER  Leave blank.
4. NAME  Type full name of person investigated. Include aliases and nicknames.
5. ADDRESS  Enter complete address of person investigated, include phone number.
6. DATE OF BIRTH  Type in date of birth of person investigated. Use numbers for month, day and year.
7. PLACE OF BIRTH  Enter city and state or country of birth. Use accepted abbreviations.
8. MARITAL STATUS  Self-explanatory.
9. SPOUSES FULL NAME  Type full name of spouse. If wife, include maiden name or names by any other marriages.
10. AGE  Enter age of person at time of investigation. Use numbers.
11. SEX  Type sex. Use M for male and F for female.
12. RACE  Enter race of person investigated. Use the following guide:
 W for White
 N for Negro
 I for Indian (American)
 C for Chinese
 J for Japanese
 O for Other
13. HEIGHT  Use numbers.
 EXAMPLE: 5-10
14. WEIGHT  Use numbers.
 EXAMPLES: 165

*564 15. HAIR  Self-explanatory.
16. EYES  Self-explanatory.
17. COMPLEXION  Self-explanatory.
18. OCCUPATION  Enter current occupation.
19. EMPLOYER/BUSINESS  Type in name of employer. If self-employed, enter name and nature of business.
20. EMPLOYER'S ADDRESS  Enter address of employer or business, include phone number.
21. OTHER DESCRIPTIVE INFORMATION  List scars, marks, tattoos, physical deformities and/or defects.
22. ARREST RECORD  Enter yes or no.
23. SBI NUMBER  Type S.B.I. number, if available.
24. FBI NUMBER  Type F.B.I. number, if available.
25. OTHER NUMBERS  Enter your department or agency, other police or out of state bureau numbers, if available.
26. MV RECORD  Enter yes or no.
27. DRIVERS LICENSE NUMBER  Type full driver license number.
28. STATE  Enter name of state issuing driver license.
29. SOCIAL SECURITY NUMBER  Type Social Security Number, if available.
30. ASSOCIATES  Enter names and addresses of associates, include aliases and nicknames. List additional associates in Narrative.
31. VEHICLE INFORMATION  Enter information on vehicles registered to or used by subject. List additional vehicles in Narrative.

*565 32. EVALUATION OF SOURCE  Evaluate the source by checking the box which most nearly describes the informant:
 Completely Reliable
 Fairly Reliable
 Unreliable
 Reliability Unknown
33. EVALUATION OF INFORMATION  Evaluate information by checking the box which most nearly describes the contents:
 Confirmed by Other Source
 Possibly True
 Improbable
 Cannot be Judged
34. NARRATIVE
a. Report on the categories listed in Block 33 which are essential to complete information.
b. Information previously included elsewhere on this report need not be repeated in the Narrative.
c. Use this section to furnish additional information.
d. If additional space is required, use Continuation Page, SP Form 420A
35. REPORTING DATE  Type date this report was prepared using number for month, day and year.
36. NAME  Type rank and name in block. (Sign all copies above block.)
37. BADGE NUMBER  Type badge number in block, if any.
38. PAGE OF PAGES  May be filled in with ball point pen when report is completed.
*566