**John R. BALELO, Andrew Castagnola, Leo Correia, Manuel S. Jorge, Bryan R. Madruga, Harold Medina, John A. Silva, Ralph F. Silva, Jr., George Sousa, Manuel S. Vargas, Jr., John B. Zolezzi, Jr., Plaintiffs,**

**v.**

**Philip M. KLUTZNICK, Secretary of Commerce of the U. S., Richard A. Frank, Administrator, National Oceanic and Atmospheric Administration and Terry Leitzell, Assistant Administrator for Fisheries, National Marine Fisheries Service, Defendants.**

**Environmental Defense Fund, Inc., and Defenders of Wildlife, Intervenor-Defendants.**

No. 80–1646–GT(H).

United States District Court, S. D. California.

July 24, 1981.

---

Raymond F. Zvetina, Haskins, Nugent, Newnham, Kane & Zvetina, San Diego, Cal., for plaintiffs.

Donald A. Carr, Dept. of Justice, Washington, D. C., for U. S.

Wayne S. Braveman, Tuttle & Taylor, Inc., Los Angeles, Cal., for intervenor-defendants.

## MEMORANDUM DECISION AND ORDER

GORDON THOMPSON, Jr., District Judge.

The case at bar concerns the statutory and constitutional validity of the federal observer program on U. S. tuna vessels which fish in association with porpoise. The issue is whether data gathered by these mandatory on-board observers may be used against the vessel and crew in civil, criminal and forfeiture proceedings. The material facts are not in dispute and the case comes before the Court on cross-motions for summary judgment.

A bit of background concerning tuna purse-seining and the Marine Mammal Protection Act is appropriate. Tuna, especially yellowfin, tend to swim in association with porpoise, which are marine mammals. Capitalizing on this known, but scientifically unexplained phenomenon, tuna purse-seiners often set their nets around schools of porpoise in order to encircle the tuna swimming beneath. In the process of pursing the net, some porpoise may become entrapped and be drowned or injured.

Over the years, the fishermen have developed techniques and gear designed to minimize porpoise mortality and injury, such as smaller mesh nets, escape panels, and a back-down maneuver which causes part of the net to submerge, allowing the porpoise to swim free. Since 1972, porpoise mortality has declined from approximately 300,000 to approximately 18,500 in 1979, based upon figures extrapolated from observed vessels.

In 1972, Congress enacted the Marine Mammal Protection Act, 16 U.S.C. § 1361, et seq., which imposed a moratorium on the taking of marine mammals, but excepted the commercial fishing industry during a two-year period of research and development. Thereafter, the incidental taking of marine mammals in connection with commercial fishing could be allowed by the Secretary of Commerce subject to regulations and permits. 16 U.S.C. §§ 1371, 1374. The Secretary has issued a comprehensive set of regulations, 50 C.F.R. § 216, et seq., which cover nearly all aspects of tuna fishing "on porpoise," from prohibition of setting on certain species of porpoise, to net and maneuvering requirements, to minutiae such as the condition of speedboats, scuba gear and face masks. The penalties provided by the Act for violation of these regulations are severe, ranging from civil penalties of $10,000.00 for each violation, to criminal penalties of one-year imprisonment and/or $20,000.00 fine, to forfeiture of the catch (which may have a value in excess of one million dollars). 16 U.S.C. §§ 1375, 1376.

The case centers about one of the regulations adopted by the Secretary of Commerce, 50 C.F.R. § 216.24(f), which in its present form (effective January 1, 1981) reads in pertinent part:

"(f) *Observers* . . . (1) The vessel certificate holder of any certified vessel shall, upon the proper notification by the National Marine Fisheries Service, allow an observer duly authorized by the Secretary to accompany the vessel on any or all regular fishing trips for the purpose of conducting research and observing operations, *including collecting information which may be used in civil or criminal penalty proceedings, forfeiture actions, or permit or certificate sanctions.*" [Emphasis added.]

Under this regulation, the National Marine Fisheries Service ("NMFS"), a division of the National Oceanographic and Atmospheric Administration, stations federal observers, denominated "biological technicians," aboard tuna vessels for the duration of a fishing trip, which often lasts two to three months and ranges thousands of miles into the ocean. The observer berths with the crew and takes his meals with captain and crew in the ship's galley (at government expense). During all fishing operations, the observer positions himself on deck and methodically records in numerous log books and forms detailed information regarding porpoise stocks and species, and the compliance of the vessel with the regulations. As part of his duties under the Field Manual issued by NMFS, the observer ques-

tions captain and crew regarding their estimates of porpoise. This data is then turned over to the enforcement branch of NMFS, which issues notices of violations against the vessel and crew. Such notices based upon observer-gathered data have been issued and administrative proceedings instituted, commencing in August 1977 under predecessor regulations. Unless restrained, the Secretary indicates he will continue so to use the observer data.

Plaintiff tunaboat captains contend that the observer program as implemented by the regulation is in violation of the statute and of the Fourth Amendment of the Constitution. Defendants contend that it is a valid, and the only practical, method of enforcing compliance with the Act. The starting point for analysis is whether the stationing of the observer on the vessel constitutes a "search" within the meaning of the Fourth Amendment.

■ Recent decisions of the Ninth Circuit have made it clear that the mere boarding of a vessel, commercial or private, by government agents for any type of investigation or inspection is a search within the Fourth Amendment. This was the specific holding of *United States v. Raub*, 637 F.2d 1205 (9th Cir. 1980), which involved the boarding of a fishing vessel by an NMFS agent to check the owner's Indian identification card. Also, in *United States v. Piner*, 608 F.2d 358 (9th Cir. 1979), the boarding of a pleasure craft in San Francisco Bay for routine safety and document check was held to be a search. Since under the observer program there is boarding by government agents who have, as one of their express purposes, the gathering of information for use in civil, criminal or forfeiture proceedings against the vessel or crew, their entry and presence on board must be deemed a search.

■ Arguments advanced by Defendants and Intervenors that this is not a search under the "plain view," "open fields," or "public view" doctrines are inapposite. As the Supreme Court made clear in *Coolidge v. New Hampshire*, 403 U.S. 443, 464–473, 91 S.Ct. 2022, 2037–2042, 29 L.Ed.2d 564 (1971), "plain view" applies only where the initial intrusion is justified and the observation inadvertent or fortuitous. Here, the observation is not inadvertent, but specifically intended. The "open fields" doctrine regards technical trespasses or insignificant intrusions onto the open exterior areas of private property as "de minimis" and immaterial to the validity of observations made as a result of such intrusions. Here the intrusion is not insignificant or "abstract and theoretical," but substantial. "Public view" applies where law enforcement makes observations in the same fashion as members of the public. As the Supreme Court indicated in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920 (1979), the law enforcement officer must truly be positioned and act as a member of the public, and not assume prerogatives and vantage points not accorded to the public. Here, since members of the public are not permitted aboard tuna vessels at sea, the observer has a private vantage point carved out specially for observers by the regulation and not available to the public.

Thus, the various "view" doctrines are inapposite since the initial boarding of the vessel which gives the observer his continuous viewing platform is itself a search within the Fourth Amendment. The issue then is the authority for the search.

■ It is axiomatic that an administrator is a creature of statute and that his authority derives solely from the statute pursuant to which he acts. *Soriano v. United States*, 494 F.2d 681, 683 (9th Cir. 1974); *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936). We turn then to the statute to ascertain the Secretary's authority to adopt the search regulation.

Congress did, in enacting the Marine Mammal Protection Act, provide specifically for a type of observer program. In § 1381, the Congress established a two-year period of research and development of new fishing techniques and gear to minimize porpoise mortality and injury and an ob-

server program for research related thereto. It is obvious from that section, however, that the sole function of the observers was research and development, and that they had no enforcement role. In any event, that express statutory authorization expired by its own terms on October 21, 1974, and Defendants do not, nor could they, seek to base the Secretary's authority on that section.

■ In § 1377 of the Act, entitled "Enforcement," Congress expressly conferred authority for searches pursuant to the Act and set the standard for such searches. That section empowered enforcement officers to:

"(2) with a warrant or other process, or *without a warrant if he has reasonable cause* to believe that a vessel or other conveyance subject to the jurisdiction of the United States or any person on board is in violation of any provision of this subchapter or the regulations issued thereunder, *search such vessel,* or conveyance and arrest such person." [Emphasis added.]

Thus, it is clear that Congress authorized warrantless searches under the Act, but only if there exists reasonable cause to believe that the vessel or a person on board is in violation of the Act or regulations.

In the context of search, arrest and forfeiture, the terms "reasonable cause" and "probable cause" have traditionally been used interchangeably. *Stacey v. Emery,* 97 U.S. 642, 645, 24 L.Ed. 1035 (1878); *United States v. 83 Sacks of Wool, Etc.,* 147 F. 747, 748 (D.Me.1906); *Schnorenberg v. United States,* 23 F.2d 38, 39 (7th Cir. 1927); *Levine v. United States,* 138 F.2d 627 (2nd Cir. 1943); *United States v. Fay,* 240 F.Supp. 591, 594 (S.D.N.Y.1965), *cert. denied,* 384 U.S. 964, 86 S.Ct. 1592, 16 L.Ed.2d 675 (1966).

Defendants admit that the placement of observers on tuna vessels is without a warrant and without specific probable cause to believe that the vessel or any person on board is in violation of the Act or regulations. Since the regulation purports to authorize searches of tuna vessels without a

warrant and without reasonable cause to believe the vessel or a person on board is in violation of the Act or regulations, it is in direct contravention of § 1377 of the Act, which requires reasonable cause. A regulation which contravenes its enabling statute is void. As the Supreme Court held in striking down a regulation in *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936):

"The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute is a mere nullity." 297 U.S. at 134, 56 S.Ct. at 400.

Defendants and Intervenors seek to avoid this clash between the express terms of the statute and the regulation. Defendants point to the fact that § 1377 applies to "enforcement officers," and that under the NMFS Field Manual (1981) observers are not enforcement officers. The mere fact that the observer may not be endowed with arrest authority does not mean he performs no enforcement function. His gathering of data for use in civil and criminal proceedings is an important investigative part of the enforcement function. The fact that it is some other branch of the NMFS which converts the data into notices of violation or charges does not immunize the observer's role from the reach of § 1377. If an officer endowed with full enforcement authority is required under § 1377 to have reasonable cause for a warrantless search, one endowed with only partial enforcement authority can claim no superior position.

Intervenor points to the fact that § 1377 applies to all vessels subject to United States jurisdiction under the Act, whether they fish on porpoise or not. This is true, but provides no basis for excepting vessels which do fish on porpoise from the blanket

provisions of § 1377, which, by their terms, apply to the entire Act and admit of no exception.

The regulation flies squarely in the face of § 1377 of the Marine Mammal Protection Act and is void.

Defendants and Intervenors lay heavy stress on the contention that the observer program is the only practical means of monitoring compliance with the Act, and that the use of aircraft or vessels for surveillance would be cost-inefficient and result in spotty oversight. On the basis of expediency and the broad powers conferred upon the Secretary to adopt regulations he deems "necessary and appropriate," they urge the Court to find in the Act implied authority for the Secretary's regulation. Of course, such authority cannot be implied if it contravenes the express language of the statute.

Assuming arguendo that § 1377 did not act as a bar to such an implication of authority, there are other reasons why that power cannot be implied. The Court cannot imply the authority in an administrator to define and delineate the scope of his own search authority. As pointed out by the Supreme Court in *United States v. United States District Court*, 407 U.S. 297, 316, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972), the executive officer is not a neutral and detached magistrate, but the enforcer of the law.

"But those charged with this investigation and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks."

■ It follows that the Court should not imply authority in the administrator to determine whether he may search without a warrant and without probable cause.

Finally, Defendants argue that an agency interpretation of its enabling statute is entitled to great weight and that Congress has ratified that interpretation by failure to object and by renewing appropriations under the Act. The Supreme Court has indicated in *Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969), and

*S.E.C. v. Sloan*, 436 U.S. 103, 120, 98 S.Ct. 1702, 1713, 56 L.Ed.2d 148 (1978), that an agency interpretation is but one ingredient of the interpretational equation, and that it has greatest weight when the agency participated in drafting the statute and made its interpretation known to Congress at that time. Here there is no contention that the agency interpretation was made known to Congress at the time the statute was adopted in 1972. In fact, the first time the agency issued notices of violations based upon observer data was in August 1977, long after the passage of the Act. In *S.E.C. v. Sloan*, 436 U.S. 103, 120, 98 S.Ct. 1702, 1713, 56 L.Ed.2d 148 (1978), the Supreme Court struck down an agency practice of 34 years' standing even though the Senate committee charged with the oversight of the S.E.C. knew of and specifically endorsed the practice. Also, in *Zuber v. Allen*, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969), the Court invalidated an agency interpretation of many years' duration despite an intervening re-enactment. *See, also, TVA v. Hill*, 437 U.S. 153, 193, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117 (1978).

The Court is impressed, too, with the fact that in 1977 the Secretary proposed an amendment to the Act which would have made explicit his authority to use observer data for enforcement purposes. The amendment, while approved by the House, was never taken up by the Senate. See, Hearings before the Committee on Merchant Marine and Fisheries, House of Representatives, 95th Congress, First Session, May 1977, Serial No. 95–3, pp. 35, 109. The post-enactment legislative history does not support the contention that Congress "ratified" the Secretary's interpretation of the Act.

■ In any event, there is a superseding principle which operates here, making implied authority and ratification irrelevant. A considerable body of case law holds that where agency action affects substantial constitutional rights, or is of questionable constitutionality, an explicit congressional authorization is required rather than impli-

cation or acquiescence. *See, e. g., Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Kent v. Dulles*, 357 U.S. 116, 131, 78 S.Ct. 1113, 1121, 2 L.Ed.2d 1204 (1958); *Schneider v. Smith*, 390 U.S. 17, 26, 88 S.Ct. 682, 687, 19 L.Ed.2d 799 (1968); *see, also, S.E.C. v. Sloan*, 436 U.S. 103, 112, 98 S.Ct. 1702, 1708, 56 L.Ed.2d 148 (1978). As the Supreme Court stated in *Greene v. McElroy*:

> "If acquiescence or implied ratification were enough to show delegation of authority to take actions within the area of questionable constitutionality, we might agree with respondents that delegation has been shown here . . . Such decisions cannot be assumed by acquiescence or non-action. [Citations omitted.] They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, . . ., but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them." 360 U.S. at 506, 507, 79 S.Ct. at 1418, 1419.

For all of these reasons the Court is persuaded that the Secretary has neither express nor implied authority to adopt the regulation, and it is void.

The very facts which render the regulation invalid under the statute also render it a violation of the Fourth Amendment.

▮ A warrantless search is per se unreasonable unless it falls within one of the recognized narrow exceptions to the warrant requirement. *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967); *See v. City of Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978). The only exception urged by Defendants is the "pervasively regulated industry" exception carved out and elaborated upon by the Supreme Court in three cases: *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); and *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).

Careful analysis of these cases, as well as lower court decisions following in their wake, indicates that the minimum requirements of the exception are (1) an industry which has been subject to historical or pervasive federal regulation such that warrantless inspection is both necessary and to be anticipated, and (2) a statute explicitly authorizing the warrantless inspection. As the Court states in *Biswell*:

> "In the context of a regulatory inspection system of business premises that is carefully limited in time, place and scope, the legality of the search depends not on consent but on the authority of a valid statute." 406 U.S. at 315, 92 S.Ct. at 1596.

The parties have cited, and the Court is aware of, no case which has upheld a warrantless regulatory administrative inspection in the absence of an express statutory authorization for such inspection. The rationale for this requirement of an express statute is undoubtedly to be found in the statement previously quoted from *United States v. United States District Court*, 407 U.S. 297, 316, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972), regarding the traditional role of the detached and impartial magistrate in the issuance of a warrant, i. e., the magistrate assures that there is probable cause for the search and that the scope of the search is appropriately limited in time, place and scope. As the Court points out, an administrator cannot fulfill these traditional functions of the magistrate since he, himself, is the searcher. Congress, however, being elected by and responsive to the people, and presumably sensitive to their

constitutional rights, comes closer to fulfilling the role of the magistrate than any administrator can. Accordingly, a properly drawn statute in appropriate cases may substitute for the warrant. *See, United States v. Cooper,* 409 F.Supp. 364, 368 (M.D., Fla.1976), *aff'd.,* 542 F.2d 1171 (5th Cir. 1976). While the courts remain the ultimate arbiters of the reasonableness of a search even where authorized by Congress, *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *United States v. Piner,* 608 F.2d 358 (9th Cir. 1979); *United States v. Taylor,* 488 F.Supp. 475 (D.Or.1980), on the whole, deference has been shown to the congressional determination of the standard of reasonableness. *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

■ Viewing the regulation in the light of these principles, the Court finds that, insofar as it purports to allow a warrantless search without reasonable cause, it is not expressly authorized by the statute. Accordingly, the "pervasively regulated industry" exception to the warrant requirement is inapplicable, and the search is therefore in violation of the Fourth Amendment.

■ The Defendants and Intervenors, finally, seek to justify the regulation as within the broad authority of the Secretary under § 1374 to issue permits authorizing the incidental taking of mammals with "any other terms or conditions which the Secretary deems appropriate." The argument is that since the Secretary may prohibit fishing on porpoise altogether, he may permit it subject to the condition of compliance with the regulation. But, inasmuch as the regulation is invalid under the statute and the Constitution, the Secretary certainly may not condition the grant of a permit upon compliance with an invalid regulation. This would permit him to do indirectly what he cannot do directly. Also, a long line of respectable authority stands for the proposition that the government may not condition a privilege (especially to pursue one's livelihood) upon compliance with an unconstitutional requirement. *Frost v. Railroad*

*Commission,* 271 U.S. 583, 593, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926); *United States v. Chicago Milwaukee, Etc. R. R.,* 282 U.S. 311, 328, 51 S.Ct. 159, 163, 75 L.Ed. 359 (1931); *Standard Airlines v. Civil Aeronautics Board,* 177 F.2d 18 (D.C.Cir.1949); *Smyth v. Lubbers,* 398 F.Supp. 777 (W.D. Mich.1975).

The Court therefore concludes that the regulation contravenes both the Marine Mammal Protection Act and the Fourth Amendment of the Constitution and is invalid. If indeed the Secretary believes he has not been given the tools to carry out his assigned responsibilities, the appropriate remedy is to petition Congress, and not to ask the Court to rewrite the language of the statute or the Constitution. *See, e. g., TVA v. Hill,* 437 U.S. 153, 194–195, 98 S.Ct. 2279, 2301–2302, 57 L.Ed.2d 117 (1978). The protection of marine mammals from careless depredation is an important societal value as manifested by the Marine Mammal Protection Act, but it cannot be furthered by the violation of the Fourth Amendment rights of fishermen. The observer program as implemented by the regulation is an extraordinarily intrusive invasion of privacy, entailing the compelled 24-hour a day presence of government agents on Plaintiffs' vessels for two to three months at a time. Whether Congress could constitutionally impose such a program on tuna vessels under the Act is not before the Court, and no opinion on that subject is expressed here. If such a constitutionally sensitive program is to be adopted, however, that choice must be clearly made and declared by Congress, and not by the administrator.

### ORDER

The Court declares:

1. That the regulation, 50 C.F.R. 216.-24(f), insofar as it allows observers to gather data and information for use in civil or criminal penalty proceedings, forfeiture actions, or permit or certificate sanctions is invalid and void.

2. The Court permanently enjoins Defendants, their successors, agents, employ-

ees and anyone acting on their behalf from using observer-gathered data or information under the regulation, or its fruits, for civil or criminal penalty proceedings, forfeiture actions, permit or certificate sanctions, or for any purpose except scientific research.

3. The Court permanently enjoins Defendants, their successors, agents, employees and anyone acting on their behalf from requiring Plaintiffs, as a condition to the granting of permits or certificates of inclusion to fish for tuna in association with porpoise, to accept the on-board presence of observers whose information or data may be used for any purpose except scientific research.