**Nikki G. CRAFT, et al., Plaintiffs,**

**v.**

**Donald P. HODEL, et al., Defendants.**

**Civ. A. No. 86–3558–WD.**

United States District Court,
D. Massachusetts.

April 4, 1988.

Jeffrey Denner, Boston, Mass., for plaintiffs.

Martha B. Sosman, Asst. U.S. Atty., Boston, Mass., for defendants.

## MEMORANDUM

WOODLOCK, District Judge.

Over thirty years ago, Justice Douglas predicted "[n]o one would suggest that the First Amendment permits nudity in public places." *Roth v. United States*, 354 U.S. 476, 512, 77 S.Ct. 1304, 1323, 1 L.Ed.2d 1498 (1957) (Douglas, J., dissenting). This case presents the precise question Justice Douglas regarded as beyond suggestion: Whether, and if so, where, when and how

the Constitution compels the government to allow nudity in public.

The plaintiffs are women who contend that a National Park Service regulation (the "Regulation")[1] prohibiting public nudity—particularly the exposure of female breasts—at the Cape Cod National Seashore violates their First Amendment right to free expression and their Fifth Amendment right to equal protection. They also allege certain technical procedural infirmities in the promulgation of the Regulation.

The plaintiffs appear to fall into two basic, and overlapping, categories: (I) those who assert that the Regulation prevents them from enjoying the pleasures of the beach in the nude; and (II) those who assert that the Regulation prevents them from using public nudity to express their views on subjects of public interest and concern.

### I

The interests of the first category of plaintiffs have been adjudicated adversely to them by controlling precedent in the First Circuit. *Williams v. Kleppe*, 539 F.2d 803 (1st Cir.1976). In *Williams*, where precisely the same regulation that plaintiffs put in issue here was under attack, the Court ended its opinion with the holding that "[i]t is clear that the Fifth Amendment liberties requiring the kind of protection urged here by appellants do not encompass the right to bathe in the nude at the Cape Cod Seashore National Park." *Id.* at 807.

 The plaintiffs in this case have presented nothing to suggest that *Williams* has lost its vitality on this point and I find it controlling law rejecting the claim set forth by the first group of plain-

---

1. The Regulation, 36 C.F.R. 7.67(g), was promulgated in May 1975 by the United States Department of Interior, National Park Service. It provides that:

 Public nudity, including public nude bathing, by any person on Federal land or water within the boundaries of Cape Cod National Seashore is prohibited. Public nudity is a person's intentional failure to cover with a fully opaque covering that person's own genitals, pubic areas, rectal area, or female breast be-

 low a point immediately above the top of the areola when in a public place. Public place is any area of Federal land or water within the Seashore, except the enclosed portions of bathhouses, restrooms, public showers, or other public structures designed for similar purposes or private structures permitted within the Seashore, such as trailers or tents. This regulation shall not apply to a person under 10 years of age.

tiffs that the Regulation unconstitutionally prevents them from enjoying the pleasures of the beach in the nude.[2]

## II

The second group of plaintiffs, those who claim they are prevented by the Regulation from engaging in direct expression by exposing their breasts, look hopefully to dicta contained in footnote 9 of *Williams*. There the First Circuit drew a distinction between "groups concerned with discussing and promoting a pleasurable activity [whose First Amendment claims were not presented in *Williams* ], and those gatherings of people merely desiring to pursue that activity where it can take place [whose claims were rejected in *Williams* ]." 539 F.2d at 806 n. 9. Whether that distinction would make a difference was left unsaid in *Williams*. To the degree that the plaintiffs present themselves as asserting the interests of those concerned with the expressive role of nudity, *Williams* is not directly controlling and more extended discussion is necessary.

### A

Throughout the large and growing body of caselaw rejecting attacks on the regulation of public nudity, courts have left dicta, like pieces of driftwood abandoned on an otherwise barren shore, suggesting that on certain occasions, in special circumstances, public nudity may constitute protected speech. For example, the Eleventh Circuit observed, in the course of an opinion upholding a nude bathing ordinance, that " 'nudity is protected as speech . . . when combined with some mode of expression which itself is entitled to first amendment protection.' " *South Florida Beaches, Inc. v. City of Miami,* 734, F.2d 608, 610 (11th Cir.1984). The Eleventh Circuit's observation was drawn from an earlier opinion by Judge Pratt in the Eastern District of New York, *Chapin v. Town of Southampton,* 457 F.Supp. 1170 (E.D.N.Y.1978), in which

Judge Pratt also observed that "the desire of a group to sunbathe nude does not without more raise a constitutional right in that group to associate nude on a public beach." *Id.* at 1175. These observations raise the prospect that if nudity is combined with some mode of expression—or there is otherwise "something more"—public nudity may be clothed with expressive qualities worthy of constitutional protection.

These suggestive dicta seem to find their support in doctrines of symbolic speech which provide that conduct may be First Amendment protected "speech" when the actor intended "to convey a particularized message," and where "the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974).

Provocative suggestions that with "something more" public nudity becomes protected speech do not, however, survive sustained scrutiny. First, public nudity cannot be understood to convey a particularized message to those who view it. Second, even if it were to be so understood, the prohibition of the use of public nudity as a mode of expression is constitutionally tolerable under the time, place and manner regime established by the Regulation.

### 1. *Nudity as Protected Expression*

In the largest sense, nudity, of course, can be expressive of meaning. Lord Clark, for example, canvassed the history of painting and sculpture in a book through which he "tried to show how the naked body has been given memorable shapes by the wish to communicate certain ideas or states of feeling." K. Clark, *The Nude* 335 (1956) (Penguin ed. 1987). And in the most expansive statement of their claims the plaintiffs contend that their use of their bodies in an exposed manner is also rich with meaning. For example, the plaintiffs Nikki Craft, Michele Joy Handler, Laurel

---

**2.** The plaintiffs' Fifth Amendment claim here has been restyled to present an equal protection argument, apparently to avoid reliance upon the substantive due process contention rejected in *Williams.* As developed more fully in Section

III *infra,* the equal protection variation on the Fifth Amendment claim has no greater merit than the previously unsuccessful substantive due process theme.

Brooke and Gabriel Brooke assert that their shirtfree appearances on the Seashore have been designed to provide expressions of opposition to the exploitation and inequitable treatment of women in American society.

Plaintiffs maintain that "[e]xpressive nudity is not a matter of individual appearance or privacy, but is rather a public expression of political, ideological and artistic conviction." In parallel fashion, commentary has discerned an "almost invariabl[e] . . . message in favor of more relaxed sexual mores," in the use of symbols of sexuality as a means of communication. Stone, *Restrictions of Speech Because of Its Content: The Peculiar Case of Subject–Matter Restrictions*, 46 U.Chi.L.Rev. 81, 111–12 (1978).

To the degree, however, that the plaintiffs contend that the medium of their bodies is necessary to convey adequately the message they present, the plaintiffs face formidable doctrinal difficulties. At the threshold is the distinction drawn in *Williams* itself. And the case law requiring "something more" suggests that this implicit message conveyed by public nudity simpliciter does not implicate the First Amendment.

■ This is principally because nudity alone conveys no specific content to whatever message is communicated. The plaintiffs would have it that their message of protest against exploitation is conveyed particularly by their nudity. But that is only a matter of perspective. Quite different messages, indeed the precise polar opposites to the messages the plaintiffs offer, are presented on a regular basis when this Court examines allegedly obscene materials pursuant to forfeiture proceedings under 19 U.S.C. § 1305. There the female breast is presented as an object for manipulation, abuse and male domination. In short, public nudity does not convey any specific message, at most it is a medium by which a variety of messages may be conveyed. The medium of nudity is not a particular message, the medium is simply the medium.[3]

I recognize that in certain contexts nudity has been held to constitute expression entitled to First Amendment protection of some sort. For example, the Supreme Court in *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211 n. 7, 95 S.Ct. 2268, 2273 n. 7, 45 L.Ed.2d 125 (1975) observed that "[s]cenes of nudity in a movie, like pictures of nude persons in a book, must be considered as a part of the whole work." *See also Schad v. Mt. Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (nude dancing as live entertainment); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (topless dancing). In this connection, however, it should be noted that the Court in *Erznoznik* was careful to add in the same footnote that nudity in movies "is distinguishable from the kind of public nudity traditionally subject to indecent-exposure laws." 422 U.S. at 211 n. 7, 95 S.Ct. at 2273 n. 7.

For purposes of this memorandum, I will assume *dubitante*, in the words of the Supreme Court in *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), that under circumstances alleged by some of the plaintiffs here, their shirtfree appearances at the Seashore constitute "expressive conduct protected to some extent by the First Amendment." *Id.* at 293, 104 S.Ct. at 3069.

Accordingly, I turn to an evaluation of the Regulation as a means to regulate nudity as expression.

2. *Regulation of Expressive Nudity*

As in *Clark v. Community for Creative Non–Violence*, the proscription at issue here is a limitation on the *manner* in which demonstrations may proceed. The Regulation does not in any way ban certain types of artistic performances while allowing others; nor does it prohibit demonstrations concerned, in plaintiffs' terms, with "women's rights" while permitting those in sup-

---

**3.** The futility of attaching a particular message to public nudity is reminiscent of the problem confronted by a certain concert violinist. The Maestro was engaged by an admirer after a concert and asked what the violin was supposed to be saying to the audience during the performance. He thought for a while and then responded, "It was saying 'I am a violin.'"

port of "sexist values." Rather, the regulation challenged here is plainly not based " 'upon either the content or subject matter of speech.' [And] [t]here is nothing in the text or the history of the regulation[ ] to suggest that one group's viewpoint is to be preferred at the expense of others." *White House Vigil v. Clark,* 746 F.2d 1518, 1527 (D.C.Cir.1984). The Regulation is content neutral. It simply regulates the way in which protected activities may be carried on and it requires that they be carried on clothed. The Regulation must, therefore, be evaluated under the tests applied to time, place and manner impingements on speech.

■ For the Regulation to pass constitutional muster as a valid time, place and manner restriction, it must:

a. be justified without reference to the content of the regulated speech;

b. serve a significant or important governmental interest;

c. be narrowly tailored to serve that interest; and

d. leave open ample channels for communication of the information, the expression of which it restricts.

*Clark,* 468 U.S. at 293, 104 S.Ct. at 3069. I turn to those four considerations.

a. Is the Regulation Content neutral?

Yes. As noted above, the Regulation bans nudity irrespective of the message it conveys.

b. Does the Regulation Serve Substantial or Important Governmental Interests?

The defendants have maintained that three substantial governmental interests are served by the Regulation: (i) preservation of the natural Seashore environment and the promotion of aesthetics; (ii) preservation of the Seashore as a beach available for the enjoyment of all persons; *i.e.* prevention of the preemptive effect nude bathing would have on the majority's use of the public beach; and (iii) protection of the public from the offensiveness of public nudity. All three of these identified interests have been held by other courts to be "substantial" and "important." I share that view. The Regulation easily passes the "substantial governmental interest" prong of the time, place and manner test.

(i) *Preservation and Aesthetics*—The defendants contend that "[t]he 'attractiveness' of the Seashore, an attribute that would clearly be diminished by an influx of nude bathers/demonstrators, and their following of voyeurs, constitutes a substantial government interest that the National Park Service may legitimately protect." Maintaining the attractiveness of the Seashore is certainly a substantial government objective. "[T]he government has a substantial interest in the preservation and enhancement of the human environment; aesthetics are a proper focus of government regulation.... [Indeed,] [i]t is well established that the government's power to regulate private affairs encompasses the power to promote aesthetic goals." *White House Vigil,* 746 F.2d at 1528, 1534. *See also Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 806–807, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 507–508, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981); *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

(ii) *Preventing Preemption of Clothed Bathers*—Defendants maintain that nudity on the Seashore is "disturbing to other users, such as families, and causes them to avoid the beach." Defendants explain that a primary purpose of the Regulation since its initial promulgation has been to assure that the Seashore is available to *all* users. This goal has been declared an "important government interest" by the New York Court of Appeals. *People v. Hollman,* 500 N.E.2d 297, 301 (N.Y.1986) ("The effect of the nude sunbathers' repeated appearance at Bay 1 was to foreclose its use by others. The Legislature saw fit to remedy the possible crowding of surrounding beaches by prohibiting nudity altogether. There is clearly an important governmental interest in providing recreational space for the citizens of this State"). *See also Chapin v. Town of Southampton,* 457 F.Supp. at

1176 ("not only is a public beach an unlikely and unnecessary showcase for nude expression, but also nudity there significantly intrudes upon others who did not seek it out and may be offended by it"). *Cf. Clark*, 468 U.S. at 300, 104 S.Ct. at 3072 (Burger, C.J., concurring) ("Lafayette Park and others like it are for all the people, and their rights are not to be trespassed even by those who have some 'statement' to make. Tents, fires, and sleepers, real or feigned, interfere with the rights of others to use our parks"); *Close v. Lederle*, 424 F.2d 988, 990 (1st Cir.), *cert. denied*, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970) (college may forbid display of offensive, but non-obscene, nude paintings in corridor used by general public, including children, in order to protect "a captive audience" from an " 'assault upon individual privacy' ").

(iii) *Protection of Public from the "Offense" of Nudity*—Although defendants are apparently uncomfortable invoking the term "morality" as a basis for the Regulation, they have asserted that public nudity is offensive conduct, from which the government has a substantial interest in shielding the population. This asserted interest has in fact been recognized by numerous courts as legitimate and important. *See, e.g., People v. Craft*, 134 Misc.2d 121, 509 N.Y.S.2d 1005, 1009 (City Ct.1986) ("government's ... objective ... to protect the general public from being accosted by offensive conduct in public places ... is a legitimate one, and an important one"); *State v. Turner*, 382 N.W.2d 252, 255 (Minn.App.1986) ("Protection of society's norms is a legitimate legislative goal"). *Cf. Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986) (majority's moral sentiments may provide an adequate basis for prohibiting 'victimless' conduct).

The cases relied upon by plaintiffs to rebut the proposition that the government has a substantial interest in protecting the populace from the offensiveness of public nudity involve content based regulations upon speech; as such those cases are readily distinguishable from the instant time, place and manner restriction. *See, e.g.,*

*Cohen v. California*, 403 U.S. 15, 18, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284 (1971) ("we deal here with a conviction resting solely upon 'speech,' ... not upon any separately identifiable conduct which allegedly was intended by Cohen to be perceived by others as expressive of particular views but which, on its face, does not necessarily convey any message and hence arguably could be regulated without effectively repressing Cohen's ability to express himself").

### c. Is the Regulation Narrowly Tailored?

"As in most 'time, place and manner' cases, the decisive inquiry here is as to the requisite narrowness of the means employed by the government to advance its substantial interests." *White House Vigil*, 746 F.2d at 1528. Plaintiffs contend "the requisite narrowness" compels the government to select the means least restrictive of First Amendment rights to achieve its substantial interests. That contention is overbroad.

■ Narrowly tailoring a regulation as a means to a substantial governmental end does not entail selecting the least restrictive means for achieving the end. "The less-restrictive-alternative analysis invoked by [plaintiff] has never been a part of the inquiry into the validity of a time, place, and manner regulation. It is enough that the ... restriction substantially serves the Government's legitimate ends." *Regan v. Time, Inc.*, 468 U.S. 641, 657, 104 S.Ct. 3262, 3271, 82 L.Ed.2d 487 (1984) (plurality). Indeed, the District of Columbia Circuit has remarked that, "the Supreme Court's recent decisions in *Clark* and *Regan* ... establish once and for all that least-restrictive-alternative analysis is not a part of the constitutional inquiry for determining the validity of time, place and manner restrictions." *White House Vigil*, 746 F.2d at 1531 n. 97.

However, while government regulations restricting speech need not be the least restrictive means of serving substantial governmental ends, they may not be unnecessarily restrictive.

A sensible and comprehensive framework for analyzing whether a regulation is unnecessarily restrictive was provided by Judge Wald in her separate *White House Vigil* opinion. Under that framework, to be found not " 'unnecessarily restrictive for the purpose they are designed to serve,' " *i.e.* to be found narrowly tailored to serve the government's substantial purpose, challenged regulations must (i) "not unnecessarily contain provisions that entirely fail to advance the relevant governmental interest," and (ii) there must be no "alternative regulation [which] would serve the government's interest nearly as efficiently but would be demonstrably less intrusive on protected expression." *Id.* at 1543, 1544 (Wald, J., concurring and dissenting).

█ Within this framework, a regulation may restrict otherwise protected expression if such a restriction is necessary and unavoidable to the achievement of a substantial government end. "In *Regan,* because no alternative was available that could have prohibited only the speech that the government had a legitimate interest in suppressing, the Court ruled the statute could be enforced in *all* its applications." Id. at 1545 (Wald, J., concurring and dissenting) (original emphasis). If no alternative exists to restrict the "speech" the government has a legitimate interest in restricting, the government may enforce a restriction against speech that would otherwise be protected.

There are no provisions in the Regulation which entirely fail to advance the relevant governmental interests discussed in section II.A.2.b., *supra.* However, there arguably are "less restrictive means" of controlling nudity on the Seashore when it is exhibited in political demonstrations and artistic performances. The government could either (i) provide an exception to the general prohibition for nudity within the context of otherwise protected political demonstrations or artistic performances, or (ii) set aside certain beaches along the Seashore for nude bathing.

The critical variable in the equation is whether an alternative regulation exists to the outright, total ban on nudity which would also serve, e.g., the government's substantial interest in keeping the entire Seashore open to all potential users. Put somewhat differently, the issue is whether implementation of either of the "less restrictive alternatives" identified above would enable the government to accomplish its substantial and important goals of preserving the public availability and conserving the natural landscape of the Seashore. The answer to this formulation of the issue is: "No."

There is no alternative to the Regulation that would be less restrictive of protected expression and that would also serve as a means to the government's substantial ends of not permitting nudists to exclude others from using the Seashore, and preventing further erosion of the Seashore's natural qualities.

(i) *Exempting Political or Artistic Nudity from the Ban*—The "less restrictive alternative" of exempting nudity within the context of political demonstrations and artistic performances from the Regulation's general prohibition would undercut the government's objective of keeping the Seashore available to all. Allowing exceptions to the general prohibition would exclude others from the Seashore whenever "protected" nudity was on display. Only a total ban on nudity can accomplish the substantial governmental objective of enabling all persons to use the Seashore. The total ban restricts arguably "protected" nudity, but the restriction is unavoidable if those repelled by nudity are to use the Seashore. Consequently, the existence of the "less restrictive alternative" of providing an exemption for "protected" contextual nudity, does not render the Regulation invalid as insufficiently narrowly tailored to the achievement of the government's substantial end of preventing the exclusion of anyone from the Seashore.

Perhaps more importantly, this suggested "less restrictive alternative" would run afoul of separate First Amendment concerns. The effect of a selective exemption for nudity associated with political or artistic expression would be to vest administrative officials with a licensing authority dependent upon government evaluation of the

intensely subjective question whether and to what degree a particular expressive activity is political or artistic. A fundamental principle of First Amendment jurisprudence has been to avoid leaving such judgments in the hands of government officials. *See, e.g., Schad v. Borough of Mount Ephraim,* 452 U.S. at 68–71, 101 S.Ct. at 2182–84; *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969); *Staub v. City of Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958).

(ii) *Setting Aside Select Beaches for Nude Bathing*—The "less restrictive alternative" of allowing nude bathing on certain select (and secluded) beaches along the Seashore would also undercut the government's substantial interest in keeping the entire Seashore available to all. Although setting aside selected beaches for use by nudists would reduce the risk of other persons being offended by visual contact with the nudists, it would do so by legitimizing what has traditionally been viewed as a public nuisance and by reducing in absolute terms the amount of beachfront available to the bathing population as a whole. Nor would an order to the Park Service to create a wholly new nudist beach—even if this were within the Court's power, a dubious proposition at best—serve the government's interests. The exercise of such questionable power would be in derogation of the fundamental government interest in avoiding further intrusions by man made beaches on the Seashore's natural landscape. Only the existing Regulation which totally bans nudity is able to accomplish the defendants' important interests in minimizing despoliation of the area and keeping the Seashore's existing beaches open to all.

The Regulation is "narrowly tailored" to achieve its ends. The incidental restriction it imposes on that nudity which occurs within the context of otherwise protected speech is necessarily unavoidable and, therefore, constitutionally valid.

d. Does the Regulation leave open ample alternative channels of communication?

The Regulation leaves undisturbed extensive channels for communication of the views it incidentally may restrict. Plaintiffs have open to them the print and broadcast media, the streets, and even the Seashore itself for the expression of their political and artistic viewpoints. The Regulation merely compels them to wear a minimal amount of clothing if they are going to express their views on the Seashore.

■ Of course, plaintiffs contend their protest against pornography and the exploitation of women will not be as powerful if presented clothed rather than naked. They may be correct that they will not receive nearly the same publicity if they demonstrate in clothing, but there is no constitutional right to deliver messages in the most effective manner possible; nor is there a constitutional right to media coverage. As the D.C. Circuit explained in *White House Vigil,* 746 F.2d at 1538, " 'What the litigant's press agent seeks and what the public interest requires differ widely. Although every man is entitled to make his remonstrance, no man is entitled to make such a remonstrance that it will be carried on all three television networks.' " *See also id.* at 1538 n. 120; *Hollman,* 500 N.E.2d at 301 ("while it may be argued that the shock of nudity was the most effective method of conveying defendant's philosophy, no one is guaranteed a right to what he considers to be the best of all means of expression, as long as the freedom to express an idea is protected").

The Regulation satisfies each prong of the time, place and manner test. I conclude, therefore, that even if the First Amendment applies in this case, the challenged Regulation imposes a constitutionally acceptable restriction upon protected speech. Accordingly, I will grant the defendants' motion for summary judgment on all of the plaintiffs' First Amendment claims.

### B

Plaintiffs have also alleged that the Regulation is unconstitutionally overbroad on its face and as applied to their expressive conduct.

It is now settled that before a statute or regulation will be struck down as facially overbroad "its deterrent effect on legitimate expression [must be shown to be] both real and substantial." *Erznoznik*, 422 U.S. at 216, 95 S.Ct. at 2276. "[T]he requirement that overbreadth be substantial is properly used to save a statute which may reach some protected conduct while prohibiting a whole range of easily identifiable and constitutionally proscribable conduct." *Hollman*, 500 N.E.2d at 302. As noted above, the Regulation at issue in this suit implicates protected expression in extremely rare instances. The New York Court of Appeals could well have been discussing this case when it wrote: "Where, as here, the impermissible applications of a statute represent only a tiny fraction of the conduct within the statute's reach, the overbreadth will not be considered substantial." *Id. Cf. Boos v. Barry*, — U.S. —, 108 S.Ct. 1157, 1169 (1988) (ordinance regulating congregating near foreign embassies as narrowed by judicial construction "does not reach a substantial amount of constitutionally protected conduct; it merely regulates the place and manner of certain demonstrations").

■ Plaintiffs' allegation that the Regulation is overbroad as applied to their nudity must also fail. This "as applied" claim relies upon the Supreme Court's opinions in *Erznoznik, supra* and *Schad, supra* for support.

In *Erznoznik*, the Court invalidated as facially overbroad a Jacksonville, Florida ordinance that prohibited the showing of films containing nudity by a drive-in movie theater whose screen was visible from a public street. The Court concluded that "the screen of a drive-in theater is not 'so obtrusive as to make it impossible for an unwilling individual to avoid exposure to

it,'" and the Court remarked that the "offended viewer [could] readily ... avert his eyes." *Erznoznik*, 422 U.S. at 212, 95 S.Ct. at 2274. Plaintiffs here analogize their case to *Erznoznik*, and assert that "[i]ndividuals who are offended by nudity may simply avert their eyes, or, under a scheme designating clothes-optional areas, avoid them."

*Erznoznik* is, however, distinguishable from the instant case[4] in at least two important respects.

(1) Unlike the instant case, *Erznoznik* concerned a content-based regulation on speech. *See Erznoznik*, 422 U.S. at 211, 95 S.Ct. at 2273 ("The Jacksonville ordinance discriminates among movies solely on the basis of content"). Indeed, the *Erznoznik* Court specifically distinguished the type of Regulation at issue here. *See id.* at 211 n. 7, 95 S.Ct. at 2273 n. 7.

Judge Pratt, in this opinion in *Chapin*, 457 F.Supp. at 1176, accurately captured the distinction by observing:

Prohibiting nudity on the public beaches ... is a restriction on the 'place' of nudity, rather than an across the board ban on nudity of the type struck down in *Erznoznik*. As a place restriction rather than a prohibition, ... it is 'reasonable'.... *Erznoznik* struck down [an] ordinance[] which excluded nude expression from its usual showcases (bars and theatres) where interested patrons might seek it out. In contrast, not only is a public beach an unlikely and unnecessary showcase for nude expression, but also nudity there significantly intrudes upon others who did not seek it out and may be offended by it. Since prohibiting nudity on the beaches imposes minimal hardship on any true expression associated with nudity, the restriction ... is rea-

---

4. In his *Erznoznik* dissent, Justice White remarked:

The Court concludes 'that the limited privacy interest of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content.' *Ante* [422 U.S.] at 212 [95 S.Ct. at 2274]. If this broadside is to be taken literally, the State may not forbid 'expressive' nudity on the pub-

lic streets, in the public parks, or any other public place since other persons in those places at that time have a 'limited privacy interest' and may merely look the other way. *Erznoznik*, 422 U.S. at 224, 95 S.Ct. at 2280 (White, J., dissenting). Justice White's hyperbolic inferences drawn from the Court's "broadside" do not appear to have been "taken literally" in subsequent case law.

sonable and not unconstitutionally overbroad.

(2) Whereas the *Erznoznik* Court found that "the deterrent effect of this [i.e. the Jacksonville] ordinance [wa]s both real and substantial," *Erznoznik*, 422 U.S. at 217, 95 S.Ct. at 2276, the Regulation here applies to First Amendment expression in an extremely narrow range of instances. Of course, "[o]rdinarily, a law that, at the margins, regulates some harmless protected expression may not constitutionally be enforced against that expression, even if this excessive scope is insignificant enough so that the law escapes facial invalidation as overbroad.... [However,] a time, place and manner restriction that unavoidably and very marginally regulates harmless expression may be enforced against that expression." *White House Vigil*, 746 F.2d at 1546 n. 6 (Wald, J., concurring and dissenting). The regulation at issue here involves just such a restriction. It may not be found overbroad as applied.

*Schad*, the other Supreme Court case relied upon by plaintiffs to support their "overbroad as applied" allegation is also distinguishable. In *Schad*, the appellants were the owners of an adult bookstore who had been found criminally liable for violating a zoning ordinance of the Borough of Mount Ephraim. The ordinance at issue prohibited all live entertainment within commercial zones in the Borough. The appellants had been convicted of violating the ordinance by their use of a "coin-operated mechanism permitting the customer to watch a live dancer, usually nude, performing behind a glass panel." *Schad*, 452 U.S. at 62, 101 S.Ct. at 2179. The Supreme Court set aside the appellants convictions, and held that "the imposition of criminal penalties under an ordinance prohibiting all live entertainment, including nonobscene, nude dancing, violated the[ ] rights of free expression guaranteed by the First and Fourteenth Amendments of the United States Constitution." *Id.* at 65, 101 S.Ct. at 2181.

The Court acknowledged that Mount Ephraim's ordinance, unlike the ordinance at issue in *Erznoznik*, was not content-based, *i.e.* it did not "attempt[ ] to suppress the point of view of anyone or to stifle any category of ideas." *Schad*, 452 U.S. at 88, 101 S.Ct. at 2181 (Burger, C.J., dissenting). In addition, the Court acknowledged that nude dancing, live or on film, may be entitled to less First Amendment protection that other forms of entertainment. *Id.* at 66, 101 S.Ct. at 2192. Nevertheless, the Court set aside the appellants' convictions, and effectively struck down the ordinance on grounds of overbreadth.

The Court offered two principal explanations for its decision. (1) The Mount Ephraim ordinance set "significant[ ] limits [to] communicative activity within the Borough." *Id.* at 71, 101 S.Ct. at 2184. It "prohibit[ed] a wide range of expression that has long been held to be within the protections of the First and Fourteenth Amendments.... [e.g.] live entertainment, such as musical and dramatic works." *Id.* at 65, 101 S.Ct. at 2181. It had to be struck down because it had the effect, at least in theory, "'... of suppressing, or greatly restricting access to lawful speech.'" *Id.* at 76, 101 S.Ct. at 2186. (2) Mount Ephraim failed to provide adequate justifications for an ordinance which had the potential to significantly restrict protected speech. For instance, the Borough failed to "identify the municipal interests making it reasonable to exclude all commercial live entertainment but to allow a variety of other commercial uses." *Id.* at 74–75, 101 S.Ct. at 2186. The Borough, thus, did not satisfactorily answer the "initial question in determining the validity of the exclusion as a time, place, and manner restriction, ... [namely,] whether live entertainment is 'basically incompatible with the normal activity (in the commercial zones).'" *Id.* at 75, 101 S.Ct. at 2186.

Here the subject Regulation is dramatically different from the Mount Ephraim ordinance. The Regulation neither suppresses nor greatly restricts access to protected speech. Where the Mount Ephraim ordinance reached a performance of "The Sound of Music" just as readily as it reached nude dancing in an adult bookstore, the Regulation challenged here has at most an " 'incidental and minimal,' " *Id.*

at 71 n. 10, 101 S.Ct. at 2184 n. 10 (quoting Justice Powell's concurring opinion in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 78, 96 S.Ct. 2440, 2456, 49 L.Ed.2d 310 (1976)), effect on protected speech. Under the Regulation, "The Sound of Music" could be performed on the Seashore, so long as the actors were minimally clothed. Accordingly, the Regulation is not overbroad in the way an ordinance that does not permit performance of "The Sound of Music" is overbroad.

In addition, unlike the appellee in *Schad*, the defendants here have met their obligation of adequately justifying the Regulation's intrusion upon free "speech." They have shown that the Regulation is narrowly tailored to achieve significant government ends, and they have met the "time, place and manner" threshold requirement of showing that nudity is " 'basically incompatible with the normal activity [of the Seashore, to wit swimming and sunbathing by *all* interested persons].' " *Schad*, 452 U.S. at 75, 101 S.Ct. at 2186.

The challenged Regulation is as unlike the ordinance that was at issue in *Schad*, as it is unlike the ordinance that was at issue in *Erznoznik*. The successful overbreadth challenges to those ordinances are not helpful to plaintiffs' overbreadth challenges to the Regulation. The Regulation is not overbroad as applied to plaintiffs. *See also Hollman*, 500 N.E.2d at 302.

I will grant summary judgment for the defendants on the plaintiffs' overbreadth claims.

### III

Plaintiffs have alleged that the Regulation violates the equal protection component of the Fifth Amendment insofar as it permits males to walk and play and swim "shirtfree" upon the Seashore whereas it denies women the same "rights." The Regulation does, of course, distinguish between males and females and accords a "freedom" to males that it denies to females. It is, therefore, " 'subject to scrutiny under the Equal Protection Clause.' ... To withstand constitutional challenge, ... [the gender classification recognized in the Regulation] must [1] serve important governmental objectives and [2] must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976) (citations omitted).

A. *Important Governmental Objective*—Plaintiffs maintain that the disparate treatment accorded male and female chests under the Regulation does not further an important or legitimate governmental objective. Rather, they maintain, it " 'reflects archaic and stereotypic notions' ... [and] perpetuate[s] cultural stereotypes equating the female breast and women with sexual fantasies, irrespective of the wishes of women to treat their bodies with the same freedom available to men."

Plaintiffs contend that the "female breast is a secondary sex characteristic and not a sex organ per se," that the female breast is really no more of a sexual characteristic than male "facial hair." They ask rhetorically, "[I]s it not altogether clear that a naked male chest is as sexually stimulating to some as the naked female chest is to others."

Plaintiffs liken the gender-based classification in the Regulation to the gender-based policy of the state of Mississippi of excluding males from state supported nursing schools, a policy that was struck down by the Supreme Court because its only possible purpose was to assure that nursing would remain a female profession, and, thus, it tended to "perpetuate the stereotyped view of nursing as an exclusively woman's job." *Mississippi University for Women v. Hogan*, 458 U.S. 718, 729, 102 S.Ct. 3331, 3339, 73 L.Ed.2d 1090 (1982).

The Regulation at issue here is, however, distinguishable from the state policy struck down in *Mississippi University for Women*. The instant Regulation's objective is not to preserve or perpetuate the view that the female breast is a sex object. "Here, the statute's objective is to protect the public from invasions of its sensibilities, and merely reflects current community standards as to what constitutes nudity. The objective itself is not

based on stereotyped notions, therefore it is not illegitimate." *People v. Craft*, 509 N.Y.S.2d at 1010. The Regulation does not serve to perpetuate a socially and culturally developed stereotype. It simply recognizes a physical difference between the sexes which has implications for the moral and aesthetic sensitivities of a substantial majority of the country.

The Equal Protection Clause does not "require 'things which are different in fact ... to be treated in law as though they were the same.'" *Michael M. v. Sonoma County Superior Court*, 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981). "[T]he Equal Protection Clause does not mean that the physiological differences between men and women must be disregarded.... [T]hose differences must never be permitted to become a pretext for invidious discrimination.... [However,] [t]he Constitution surely does not require a State to pretend that demonstrable differences between men and women do not really exist." *Id.* at 481, 101 S.Ct. at 1211 (Stewart, J., concurring).

As an appellate court in California put the matter in rejecting an equal protection challenge to a regulation virtually identical to the one at issue here:

> Nature, not the legislative body, created the distinction between that portion of a woman's body and that of a man's torso. Unlike the situation with respect to men, nudity in the case of women is commonly understood to include the uncovering of the breasts. Consequently, in proscribing nudity on the part of women it was necessary to include express reference to that area of the body. The classification is reasonable, not arbitrary, and rests upon a ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced are treated alike.

*Eckl v. Davis*, 51 Cal.App.3d 831, 124 Cal. Rptr. 685, 696 (1975).

Every court that has considered an equal protection challenge to nude bathing and swimming restrictions has firmly rejected it. I will not part company from them. *See, e.g., Tolbert v. City of Memphis*, 568 F.Supp. 1285, 1290 (W.D.Tenn.1983) ("In our culture, for the purpose of this type of ordinance, female breasts are a justifiable basis for a gender-based classification"); *City of Seattle v. Buchanan*, 90 Wash.2d 584, 584 P.2d 918, 920 (1978) (en banc) ("there is a real difference between the sexes with respect to breasts, which is reasonably related to the preservation of public decorum and morals;" upholding gender-based nudity ordinance against challenges under the Equal Protection Clause and the state's equal rights amendment); *State v. Turner*, 382 N.W.2d 252, 255–56 (Minn.App.1986) (rejecting an equal protection challenged to a nudity ordinance, because the sex-based distinction "advances a legitimate governmental interest in the preservation of public decency and order" and is "a legislative classification based upon clear differences between the sexes").

B. *Substantial Relationship*—The Regulation's gender based distinction between male and female chests must be substantially related to the achievement of the government's important governmental objective of protecting the public from "invasions of its sensibilities." *People v. Craft*, 509 N.Y.S.2d at 1010. Here the gender based distinction clearly meets this requirement. As the *People v. Craft* court explained in rejecting an equal protection challenge [5] to a regulation similar to the one challenged in this action,

> [c]ommunity standards do not deem the exposure of males' breasts offensive, therefore, the state does not have an interest in preventing exposure of the males' breasts. A gender-neutral statute which either required both men and women to cover their breasts or eliminated the requirement for both sexes would not best serve the government's interest in preventing exposure of the female breasts. Thus, the statute's gender distinction is substantially related to the

---

**5.** The equal protection challenge in *People v. Craft* was raised by the same Nikki Craft who is a plaintiff here.

governmental objective of protecting the public from invasions of its sensibilities.

Defendants are asking the Court for a new definition of nudity which does not encompass the female breast. Yet, nudity is a social concept, a changing social perception. At present, community standards have determined that women's breasts are an intimate part of the human body, and that their exposure constitutes nudity. Although the public exposure of men's breasts may be unpalatable to some, society, acting through its legislature, has decided that such exposure is not so offensive as to require prohibition.

*Id.* at 1010–1011.

I will grant summary judgment for the defendants on plaintiffs' equal protection claims.

## IV

Plaintiffs' final arguments concern the scope of defendant Secretary's power to regulate under 16 U.S.C. § 459b–6(b) and alleged irregularities in the procedures that were used to adopt the Regulation.

First, plaintiffs argue that insofar as the Regulation "affects substantial constitutional rights," the Secretary, in promulgating the Regulation, acted in excess of his statutory authority. Although plaintiffs acknowledge that 16 U.S.C. § 459b–6(b) specifically empowers the Secretary to manage the Seashore and regulate public uses as appropriate, they assert that the statute does not expressly authorize the Secretary to promulgate regulations that implicate constitutional rights, and that without such express authorization, regulations such as the one being challenged here are without legal sanction and must be declared null and void.

As a general proposition, plaintiffs are correct. A considerable body of case law holds that where agency action affects substantial constitutional rights, or is of questionable constitutionality, an explicit congressional authorization is required. *See, e.g., Greene v. McElroy,* 360 U.S. 474, 506–508, 79 S.Ct. 1400, 1418–1419, 3 L.Ed.2d 1377 (1959); *Kent v. Dulles,* 357 U.S. 116,

129–130, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958). *But see Amalgamated Meat Cutters v. Connally,* 337 F.Supp. 737, 746 (D.D.C.1971) (Leventhal, D.J.) (delegation of legislative power is constitutionally sound so long as Congress sets out an "intelligible principle" to which the administrative agency must conform). However, Congress need not "expressly authorize any action which might be challenged on constitutional grounds," *Balelo v. Baldridge,* 724 F.2d 753, 758 (9th Cir.) (en banc), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); and, in any event, in this particular case, the general proposition does not apply.

As explained above, nudity in and of itself is not a substantial constitutional right. The subject Regulation only incidentally and minimally impinges upon areas of protected constitutional rights. The restriction placed upon plaintiffs' nudity by the Regulation simply does not rise to the level of the administrative abridgements which the cases cited by plaintiffs have held to be improper without express Congressional authorization. *See Kent v. Dulles,* 357 U.S. at 129, 78 S.Ct. at 1119 (without express authorization from Congress, the Secretary of State may not deny passports to alleged Communist Party members, because to do so impinges constitutional right to travel); *Greene v. McElroy,* 360 U.S. at 506–08, 79 S.Ct. at 1418–19 (without express authorization from Congress, the Secretary of Defense may not deny security clearance and deprive a person of his job by way of a hearing in which the employee is not permitted to confront or cross-examine witnesses, because to do so impinges fundamental and traditional safeguards of due process); *Schneider v. Smith,* 390 U.S. 17, 27, 88 S.Ct. 682, 687, 19 L.Ed.2d 799 (1968) (without express authorization from Congress, the Commandant of the Coast Guard may not screen the ideas and beliefs of personnel on American merchant vessels, because to do so impinges "'associational freedom' ... and ... other rights within the purview of the First Amendment").

The rights to travel, to due process, and to political-associational freedom are all substantial constitutional rights. These rights may not be impinged by administrative regulation without express Congressional authorization. Public nudity, however, is not a substantial constitutional right. Its impingement does not seriously affect any important interests or substantial constitutional rights. Consequently, the Regulation is not invalid merely because 16 U.S.C. § 459b–6 does not explicitly authorize the Secretary to regulate nudity.

Second, plaintiffs argue that the Regulation was promulgated in violation of applicable procedures. They argue that in November 1974, when the Federal Register announced a meeting of The Cape Cod National Seashore Advisory Commission ["Commission"] for the purpose of considering the "nude bathing issue," the Commission's charter had expired. Consequently, plaintiffs conclude, the Commission was a legal nullity at the time it made its recommendations and formulated and promulgated the Regulation; and the Regulation should, therefore, be declared void.

The answer to this contention is twofold: First, the Commission neither proposed nor promulgated the Regulation. Its role was purely advisory. Second, even if the Commission's role in the promulgation of the Regulation were relevant, it appears its charter had not in fact expired at the time of the Regulation's promulgation. I decline to strike down the Regulation on these grounds.

### V

For the reasons set forth more fully above, the plaintiffs' motion for summary judgment is hereby DENIED; the defendants' motion for summary judgment is hereby GRANTED.