Filed 7/24/13  P. v. Carranza CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B240799 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA079573) |
| v. | |
| RIGOBERTO CARRANZA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Affirmed.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Rigoberto Carranza appeals from the judgment entered following his convictions on one count of sexual penetration by a foreign object (Pen. Code,[1] § 289, subd. (d)), three counts of sexual battery by fraud (§ 243.4, subd. (c)), and three counts of misdemeanor sexual battery (§ 243.4, subd. (e)(1)).  He raises the following arguments on appeal:  (1) the sexual battery statute impermissibly discriminates on the basis of gender by prohibiting the non-consensual touching of the breast of a female, but not the chest of a male; (2) the evidence was insufficient to support the convictions for sexual penetration and sexual battery by fraud because Carranza never expressly represented that his touching of the victims' intimate body parts served a professional purpose; and (3) the trial court erred in failing to give the jury a unanimity instruction.  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

I.      **Overview of the Charges**

Carranza owned and operated a small business in Gardena, California where he provided massage therapy services and sold natural herbs and supplements.  Carranza's office consisted of a waiting room in the front with chairs for customers, a treatment room in the back with a massage table and mat, and a bathroom that was accessible from the treatment room.  Based on allegations that Carranza inappropriately touched eight female customers who sought treatment at his office between 2009 and 2010, the Los Angeles County District Attorney charged Carranza with one count of sexual penetration by a foreign object, three counts of sexual battery by fraud, and four counts of misdemeanor sexual battery.  Following Carranza's not guilty plea to all charges, his case was tried to a jury and he was found guilty on seven of the eight counts.

---

[1]      Unless otherwise stated, all further statutory references are to the Penal Code.

## II. Prosecution Evidence

### A. Count 1 – Yolanda C.

In count 1, Carranza was charged with sexual penetration by a foreign object of Yolanda C. On July 30, 2010, Yolanda went to Carranza's office with her aunt and four children because she was having a problem with her uterus. After Yolanda explained the problem to Carranza, he told her that he could help her and escorted her to the back room for treatment. At Carranza's direction, Yolanda lay face down on the massage table. He began "cracking" her back by applying pressure with his hands. He instructed her to lower her pants a few inches below her waist and proceeded to "crack" her tailbone, causing her a lot of pain. As Yolanda screamed in pain, Carranza quickly placed his hand under her clothes, "cracked" a bone near her inner thigh, and then twice inserted two fingers inside her vagina for a few seconds. Yolanda told Carranza to stop and tried to sit up. He responded that he was not yet finished, but did not provide any explanation for his procedure. Instead, Carranza grabbed a vibrating device and began to approach Yolanda with it. Seeing the device, Yolanda stood up and walked out of the room.

After paying Carranza, Yolanda went to the car with her children while her aunt stayed in the office to get a massage. Although Yolanda felt bad, she did not try to stop her aunt from seeing Carranza. While she waited in the car, Yolanda considered calling the police, but she did not know if Carranza's touching was a normal part of his treatment. Once she returned home, Yolanda threw the clothes she was wearing into the trash and took a bath. Later that night, she visited her neighbor, Maria Melendez, and cried as she told Melendez what had happened. Melendez assured Yolanda that what Carranza had done to her was not normal and advised her to contact the police. Yolanda called the police from her neighbor's house and then went to the police station the following day to file a complaint.

### B. Count 3 – Chanel C.

In count 3, Carranza was charged with misdemeanor sexual battery of Chanel C. On August 8, 2010, Chanel C. visited Carranza's office for treatment on her neck and

3

back.  In the treatment room, Carranza instructed Chanel to lie on her back on the floor. He first massaged her breasts and vagina over her clothes.  He then opened her legs and placed a vibrating machine on her vagina.  Chanel grabbed Carranza's hand in protest and moved the vibrator off her body.  At some point, Carranza told Chanel to stand up. He approached her from behind, placed his hands on her breasts over her clothes, and lifted her up.  Carranza then directed Chanel to lie down on the floor again.  He spread her legs a second time and slid his hand under her clothes touching her vagina.  Chanel moved away from Carranza and told him "no."

During the massage, Carranza asked Chanel whether she was sexually active, which made her feel uncomfortable.  He also instructed her to move her pelvic area in an up and down motion.  After Chanel complied, Carranza again tried to use the vibrator on her vagina, but she quickly moved it to the side of her leg.  When Carranza moved the vibrator back toward her inner thigh, Chanel stood up and said she was leaving.  She paid Carranza for his services, but felt stressed and confused about his treatment.  The following day, Chanel saw a television news story about Carranza and then immediately called the police.

### C.  Count 4 – Blanca H.

In count 4, Carranza was charged with sexual battery by fraud of Blanca H.  On July 27, 2010, Blanca went to Carranza's office with her mother seeking treatment for lower back pain.  Blanca's mother accompanied her into the back room and remained standing near the bathroom door.  Carranza began his treatment by standing directly behind Blanca, placing his hands over her breasts, and lifting her up to "crack" her back. Carranza did not tell Blanca why he grabbed her breasts and she felt awkward about it, but she assumed it was how he treated back pain.  After directing Blanca to lie face down on the floor mat, Carranza continued to "crack" her back over her clothing by applying pressure.

Carranza told Blanca there was something wrong with her tailbone.  He instructed her to lie face down on the massage table and to lower her pants.  He applied pressure to

4

her tailbone and caused it to pop. Carranza then began massaging the area with lotion and said that it was to prevent swelling. As Carranza was massaging Blanca's tailbone, he slid his hands under her pants and underwear and touched her vagina. When Blanca closed her legs in response, Carranza told her, "I'm not trying to do anything. I'm just going to massage so it won't swell." He opened her legs with his hand and continued massaging her tailbone, upper thighs, and the area near her vagina for three to four minutes. While he massaged Blanca, Carranza conversed with her mother about being from the same hometown.

Carranza directed Blanca to pull up her pants and turn onto her back. Without any explanation, he began using a vibrating machine on her lower abdomen and upper legs near her vaginal area. Carranza then sat on the massage table, placed Blanca's head on his lap, and massaged her torso over her clothing from her shoulders to her breasts down to her waist. Blanca was uncomfortable, but she did not say anything at that time because she thought that Carranza knew what he was doing. Carranza next sat on a chair and instructed Blanca to sit on his lap with her back toward him and her legs straddling his left knee. He told her to lean back because he wanted to see if she could put pressure on her tailbone without pain. Blanca complied and confirmed that her tailbone did not hurt.

After paying Carranza, Blanca and her mother left the office. As they were walking out, Blanca told her mother not to take anyone else to see Carranza, but she did not explain what had happened to her because she was embarrassed. She also did not initially report Carranza to the police even though she felt uncomfortable because she was uncertain if her experience was extreme enough to warrant reporting it. About two weeks after the visit, Blanca saw a television news story about Carranza and became very upset because it confirmed to her that what he had done was wrong. She then decided to contact the police.

### D. Count 5 – Luz M.

In count 5, Carranza was charged with misdemeanor sexual battery of Luz M. On July 22, 2010, Luz visited Carranza's office with her husband and their two young

daughters because she was having neck and back pain. Carranza instructed Luz to follow him into the back room by herself, but she indicated that she wanted her husband with her to feel comfortable. Luz's husband and daughters accompanied her into the room and sat together on a nearby chair. At Carranza's direction, Luz sat on the floor mat and he began massaging her neck and back. He instructed her to lie on her stomach and continued massaging her back over her clothes. Carranza then told Luz to open her legs, and using his hand, he grabbed her vagina over her pants and asked her if it hurt. Luz quickly moved Carranza's hand away from her body, closed her legs, and sat up. She did not say anything to Carranza because she was afraid of her husband's reaction.

Carranza directed Luz to lie face up on the floor. He placed a vibrating machine on her stomach over her clothes. He tried pulling down her pants, but Luz resisted and held them up. As Carranza used the machine to massage Luz's stomach, he asked her questions about her level of sexual activity and desire. Luz answered the questions because she trusted Carranza like a doctor. After paying Carranza for the massage, Luz and her family left the office. Once in the car, Luz's husband asked her if Carranza had touched her vagina. Luz initially said no because she was afraid her husband might act violently toward Carranza, but as they were driving, she told him the truth about the touching. Luz did not immediately report Carranza to the police because she felt that she had no proof. In August 2010, Luz saw a television news report concerning Carranza, and a few days later, she contacted the police.

### E.    Count 6 – A. S.

In count 6, Carranza was charged with sexual battery by fraud of A. S. On July 3, 2009, A. went to Carranza's office seeking treatment for back pain. A. told Carranza that she was very depressed because of the pain in her back and that she had not had a period in the past three years. In the treatment room, Carranza had A. stand directly in front of him as lifted her blouse and bra and placed his forearm under her breasts. Carranza lifted her breasts with his forearm and said that her breasts were heavy and affected her back. A. felt uncomfortable and pulled down her blouse and bra. Carranza lifted them up again

6

several times and touched A.'s breasts with his hands. Carranza then moved directly behind A., grabbed her breasts with both hands, and "cracked" her back. When A. told Carranza that she was still in pain, he indicated that she probably had inflammation in her backbone.

At Carranza's direction, A. sat on the massage table. As A. discussed her lack of sexual desire with her husband, Carranza massaged her kneecap and asked her if she felt anything. When A. answered that she did not, Carranza told her that she was "really fucked up." He directed her to lie on her back and began massaging her abdomen with his hands. He then pulled down her pants and underwear and said that he was going to help her with her period. A. initially tried to pull her clothes back up, but Carranza continued to pull them down until they were near her knees. A. eventually relented, but kept her eyes closed because she was embarrassed. Carranza next used a large vibrating machine to massage A.'s abdomen. With his hands, he opened her legs and placed the vibrator directly on her vagina. A. felt a suctioning sensation on her vagina, and in an upset tone, she asked Carranza, "what are you doing." At that point, Carranza stopped the massage.

As A. was leaving the office, Carranza offered to sell her pills that could increase her sexual desire. A. answered that she was not interested, paid him $20, and promptly left. Once A. arrived home, she threw her clothes in the trash, took a bath, and cried. She then called her husband and told him what had happened with Carranza. He told her to contact the police, and a few days later, A. and her husband went to the police station to file a complaint.

### F. Counts 7 & 8 – Olga G. and Carmen G.

In count 7, Carranza was charged with sexual battery by fraud of Olga G., and in count 8, he was charged with misdemeanor sexual battery of Carmen G.[2] On one occasion between November 2009 and January 2010, Olga went with her mother,

---

[2] Carranza was found not guilty on count 8.

Carmen, to Carranza's office. Carranza directed Olga to follow him into the back room. In response to Carranza's questions, Olga told him that she had neck pain, was not married, and was happy in her relationship. Carranza also asked if she was "satisfied," which she understood to mean sexually satisfied. Olga was uncomfortable, but answered the question because she believed Carranza was a doctor.

As Olga stood in front of Carranza, he grabbed her neck and "cracked" it. He then asked her to lie face down on the massage table. Carranza massaged Olga's neck and shoulders with his hands and used a large vibrating machine to massage her back, buttocks, and legs. He asked her to lie on her back and massaged her neck and chest with his hands. As he was massaging her chest, Carranza reached under Olga's shirt and bra and asked if she had breast implants. Olga was uncomfortable with the touching, but did not say anything. Carranza next used the vibrator to massage Olga's abdomen down to her pubic bone, and with one hand on her inner thigh, he tried to push her legs apart. When Olga told Carranza the pain was in her neck, he responded that it was important for her whole body to relax. Carranza continued moving the vibrator up and down Olga's inner thighs less than a finger's width from her vagina. She made a motion with her hand to stop and again said that the pain was in her neck. At that point, Carranza moved to Olga's side and she felt an erection against her stomach. At the end of the massage, Carranza escorted Olga to the waiting room. She felt uncomfortable and embarrassed by the experience, but she did not say anything to Carranza because she saw him as a doctor and an authority figure.

Carmen then went into the treatment room with Carranza. Olga did not try to stop her mother from seeing Carranza at that time because she did not believe he would engage in similar conduct with an older woman. Once in the treatment room, Carmen told Carranza that she was having lower back pain and he had her lie on her back on the massage table. Carranza lifted Carmen's blouse and lowered her pants to the pelvic area. He then began using the vibrator on Carmen's neck, shoulders, stomach, and inner thighs close to her vagina. When Carmen told Carranza that she was there for a back massage, he responded that he was massaging all of her nerves.

8

After paying Carranza, Olga and Carmen left the office. Once in the car, Carmen told Olga that Carranza had crossed the line with her. Carmen said that Carranza had held the vibrator on her lower stomach for a long time and she did not like it. Olga told her mother that she never wanted to come to Carranza's office again. Olga explained that Carranza had touched her breasts, opened her legs, and placed the vibrator where she "could feel everything." Olga asked her mother not to tell anyone what had happened because she was ashamed. A few weeks later, when Olga's neck pain continued to worsen, she sought treatment from a female chiropractor whom she told about her experience with Carranza. The chiropractor later informed Olga of the media coverage concerning Carranza, and after seeing some of the coverage herself, Olga decided to contact the police.

### G.      Count 9 – Martha C.

In count 9, Carranza was charged with misdemeanor sexual battery of Martha C. On one occasion in 2009, Martha visited Carranza's office with her then husband because she was having urinary issues. Carranza told her it was a common issue for women with children and she might have a fallen uterus. He instructed Martha to remove her pants and lie face up on the massage table. Martha lay down on the table and lowered her pants, but not her underwear. Her husband was present in the room. Using two fingers, Carranza made circular motions over the opening of Martha's vagina for about two minutes. He then used a vibrating machine to massage her abdomen and vaginal area over her underwear for about 15 minutes.

Carranza did not tell Martha why he was touching her vagina and she did not ask him because she initially thought it was a normal part of the procedure. However, she was uncomfortable with the touching, and at some point, she asked her husband to tell Carranza to stop. Martha believed that it was inappropriate in her culture for a woman to talk about sexual matters with a man and that it would have been more prudent for her husband to say something to Carranza. Martha's husband, however, did not observe any inappropriate touching by Carranza and did not intervene on her behalf.

9

A few minutes later, Carranza finished using the machine. He commented that Martha's legs were pretty which made her feel uncomfortable. After paying Carranza and returning to the car, Martha talked to her husband about what Carranza had done to her. She did not report his conduct to the police because she felt she had no proof. About a year later, Martha saw the media coverage about Carranza and was angry to learn that there were other victims. She then contacted the police.

## H. Prior Uncharged Conduct

In 2000, Rocio C., who was 18 years old at the time, went to Carranza's house in Gardena for treatment for lower back pain. She was accompanied by her mother and younger brother. They went into the living room of the house and Rocio was told to lie face up on the floor. Rocio's mother and brother sat in the living room next to Carranza's wife and chatted with her. Carranza positioned himself above Rocio's thighs and "cracked" her back and hips. He then began pressing his hands on her lower abdomen and vaginal area over her clothes. Carranza quickly slid his hand under her clothes and touched her vagina with two fingers. In response, Rocio grabbed his hand and looked at him. Carranza asked Rocio if she had hurt herself on a bike, and she told him that she had not. He removed his hand from her pants and continued to massage her body. As he was massaging Rocio's chest area, Carranza slid his hand under her clothes and touched her breasts. She was scared and confused by the touching. Carranza later took Rocio to another part of the living room and asked her to lift her shirt and bra. He applied a lotion to her chest with his hands and said it was to help relax her muscles. He massaged the lotion onto her breasts for about a minute. After paying Carranza and returning home, Rocio talked to her mother about what had happened. The following day, they reported Carranza's conduct to the police.

## I. Police Investigation and Press Release

Apart from Rocio's complaint in 2000, the first two victims to report Carranza's inappropriate touching to the police were A. in July 2009 and Yolanda in July 2010. In August 2010, following Yolanda's complaint, the Gardena Police Department issued a

10

press release concerning Carranza to local media outlets. The press release stated that Carranza, who was known as a "witch doctor," was believed to have sexually assaulted at least two female customers. It also stated that the police department believed there may be additional victims. The reference to a "witch doctor" was based on information contained in a police report in which the victim used a Spanish version of that term to describe Carranza.

### III.    Defense Evidence

The defense called the officers who interviewed the complaining witnesses to testify about the witnesses' statements to the police. Officer Frank Kim interviewed A. in July 2009. A. indicated that Carranza's office was crowded when she arrived, which was inconsistent with her trial testimony that it was empty. Officer Marisol Bazan interviewed Yolanda in July 2010. Yolanda did not disclose that she had visited Carranza's office with her aunt and merely stated that she was alone with Carranza when the incident occurred. Contrary to her trial testimony, Yolanda also told the officer that Carranza had placed a vibrating machine on her vagina during the treatment.

Detective Richard Reynaga, the investigating officer on the case, interviewed each of the eight victims. In their initial interviews, both Yolanda and A. failed to disclose that they first reported Carranza's conduct to a family member or friend, and Yolanda never said that she had visited Carranza's office with her aunt. Both Martha and Luz made statements that were inconsistent with those made by their husbands in certain details. In addition, neither Luz nor her husband ever mentioned that Carranza had used a vibrating machine during the treatment.

Five female customers and one male customer of Carranza testified on his behalf. They had sought treatment from him on a number of occasions for various injuries and ailments, including back and shoulder pain, sciatic nerve pain, carpal tunnel syndrome, and vertigo. As described by the female witnesses, Carranza would adjust the back or shoulders by standing directly behind them, placing his arms across the chest area above the breasts, and lifting them up to "crack" the back. He treated lower back and sciatic

11

nerve pain by applying pressure to the back, hips, or legs with his hands and at times massaging the area with a vibrating machine. Carranza never touched any of these women in a sexual manner or did anything during his treatment that made them feel uncomfortable. Each of the witnesses had recommended Carranza to family and friends. The defense also presented evidence that one male employee and one female employee of the Gardena Police Department had sought treatment from Carranza in the past and both had been satisfied with his services.

Carranza's son, Rigoberto Jr., testified on his father's behalf. Carranza's son had worked in the office since it opened in 2007 and handled the sales of natural products. Carranza treated 10 to 15 new customers per day, and the office was open seven days a week. The office did not have a fee schedule and Carranza only charged customers what they wanted to give. The door to the treatment room was always open and Carranza could be observed treating customers from the waiting room. Carranza's parents had performed the same type of work in Mexico, and they taught both him and his sister how to treat people's injuries and ailments.[3]

## DISCUSSION

## I.      Equal Protection Challenge to Section 243.4

Carranza first asserts that the sexual battery statute under which he was convicted violates the equal protection clause of the California Constitution because it prohibits the non-consensual sexual touching of the breast of a female, but not the chest of a male. In support of this argument, he contends that the statute impermissibly discriminates against men because there is no significant difference between male and female breasts. He also

_____

[3]      The prosecution called Carranza's sister as a rebuttal witness. She testified that she grew up with Carranza in Mexico and they received instruction from their parents on bone manipulations. The training did not include touching a woman's breasts under her clothing or touching a woman's vagina either over or under her clothing. Carranza's parents also did not instruct them on the use of a vibrating machine.

12

claims that the statute demeans women by "implying a paternalistic attitude towards women as the gentler sex needing greater protection." We conclude that Carranza's equal protection challenge fails because the statute draws a lawful distinction between male and female breasts in furtherance of a compelling government interest.

On counts 3, 5, and 9, Carranza was convicted of misdemeanor sexual battery in violation of section 243.4, subdivision (e)(1), which prohibits any person from touching "an intimate part of another person, if the touching is against the will of the person touched, and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse." On counts 4, 6, and 7, Carranza was convicted of felony sexual battery by fraud in violation of section 243.4, subdivision (c), which prohibits any person from touching "an intimate part of another person for the purpose of sexual arousal, sexual gratification, or sexual abuse" if "the victim is at the time unconscious of the nature of the act because the perpetrator fraudulently represented that the touching served a professional purpose." Section 243.4, subdivision (g)(1) defines an "intimate part" for purposes of the statute as "the sexual organ, anus, groin, or buttocks of any person, and the breast of a female."

Carranza bases his equal protection challenge on article I, section 7, subdivision (a) of the California Constitution, which provides in relevant part: "A person may not be … denied equal protection of the laws . . . ." Under California law, a classification based on gender is considered suspect for purposes of an equal protection analysis, and as such, is subject to strict scrutiny. (*Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 564; *Arp v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 400; *Sail'er Inn, Inc. v. Kirby* (1971) 5 Cal.3d 1, 17-20.) In evaluating legislation under the strict scrutiny standard, "'the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.'" (*Sail'er Inn, Inc. v. Kirby*, *supra*, at pp. 16-17.)[4]

---

[4] In contrast to California law, a gender-based classification challenged under the equal protection clause of the United States Constitution is subject to an intermediate level of scrutiny. (*Clark v. Jeter* (1988) 486 U.S. 456, 461; *Orr v. Orr* (1979) 440 U.S. 268, 279.) To withstand intermediate scrutiny under the federal equal protection clause,

""""The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment."" [Citation.]" (*In re Eric J.* (1979) 25 Cal.3d 522, 531.) Therefore, ""[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold. [Citation.]" (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

As the United States Supreme Court has observed, "a legislature may not 'make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class.'" (*Michael M. v. Sonoma County Superior Court* (1981) 450 U.S. 464, 469.) Yet equal protection of the laws "does not 'demand that a statute necessarily apply equally to all persons' or require ""things which are different in fact . . . to be treated in law as though they were the same."'" (*Ibid.*) Statutes that treat men and women differently consistently have been upheld "where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." (*Ibid.*; see also *Michael M. v. Superior Court* (1979) 25 Cal.3d 608, 611 [criminal statute prohibiting a male from engaging in sexual intercourse with a female under the age of 18 was "supported not by mere social convention but by the immutable physiological fact that it is the female exclusively who can become pregnant"].)

Statutes that draw a gender-based distinction between female and male breasts generally have been upheld against equal protection challenges in California and other

---

""""classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."""" (*Orr v. Orr, supra*, at p. 279.)

14

jurisdictions.  In *Locker v. Kirby* (1973) 31 Cal.App.3d 520, an administrative regulation prohibited certain businesses from employing bare-chested women, but not bare-chested men, on premises where alcohol was sold.  In considering the constitutionality of the statute, the Court of Appeal noted "the indisputable fact that the naked female breast has for centuries been a symbol of sexuality but that no such generalization can be made about the male chest." (*Id*. at p. 526.)  Given that fact, "the obvious physical differences between mature male and females breasts," and "the state's interest in regulating the sale of alcoholic beverages," the court concluded that the statute did not offend equal protection.  (*Ibid*.; see also *Buzzetti v. City of New York* (2d Cir. 1998) 140 F.3d 134, 143 [rejecting equal protection challenge to ordinance regulating female, but not male, topless dancing because the "male chest is routinely exposed . . . without involving any sexual suggestion" whereas "public exposure of the female breast is rare under the conventions of our society, and almost invariably conveys sexual overtones"]; *United States v. Biocic* (4th Cir. 1991) 928 F.2d 112, 115-16 (rejecting equal protection challenge to ordinance prohibiting public exposure of only female breasts and observing that societally regarded "erogenous zones . . . . still include (whether justifiably or not in the eyes of all) the female, but not the male, breast"].)

Similarly, in *Eckl v. Davis* (1975) 51 Cal.App.3d 831, the Court of Appeal upheld a city ordinance that proscribed nudity in public places and defined nudity as including an exposed female, but not male, breast.  In concluding that the ordinance did not deny women equal protection of the laws, the court observed as follows:  "Nature, not the legislative body, created the distinction between that portion of a woman's body and that of a man's torso.  Unlike the situation with respect to men, nudity in the case of women is commonly understood to include the uncovering of the breasts." (*Id*. at p. 848.)  Given the physical differences between men and women, the court determined that the gender-based classification in the ordinance was "reasonable, not arbitrary, and rest[ed] upon a ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced are treated alike." (*Ibid*.; see also *Craft v. Hodel* (D.Mass. 1988) 683 F.Supp. 289, 300 [rejecting equal protection challenge to

regulation prohibiting public exposure of female, but not male, breasts because statute "simply recognizes a physical difference between the sexes which has implications for the moral and aesthetic sensitivities of a substantial majority of the country"]; *City of Albuquerque v. Sachs* (N.M.Ct.App. 2004) 135 N.M. 578, 583 [rejecting equal protection challenge to ordinance prohibiting only females from exposing breasts in public places because statute "recognizes that females and males have different anatomies, so the objective is accomplished in a non-discriminatory manner"].)

Carranza's claim that section 243.4 violates the equal protection clause of the California Constitution fails for similar reasons. Contrary to Carranza's arguments on appeal, there are significant differences in the physical appearance and anatomical function of mature male and female breasts. While Carranza contends that society has become more "unisex" in nature, the physiological distinctions between male and female breasts continue to exist. As Justice Stewart reasoned in *Michael M. v. Sonoma County Superior Court*, *supra*, 450 U.S. 464, the equal protection clause "does not mean that the physiological differences between men and women must be disregarded. While those differences must never be permitted to become a pretext for invidious discrimination, . . . [t]he Constitution surely does not require a State to pretend that demonstrable differences between men and women do not really exist." (*Id*. at 481 (Stewart, J., concurring).) Moreover, we agree with the Attorney General that, because female breasts generally have been regarded in society as an erogenous zone, women are at a far greater risk than men of being subjected to unwanted sexual touching on their breasts. Accordingly, there is a compelling government interest in protecting females from the non-consensual touching of their breasts and the sexual battery statute is narrowly tailored to further that interest. Under these circumstances, section 243.4's gender-based distinction between female and male breasts does not deny either men or women equal protection of the laws.

## II.    Sufficiency of the Evidence on Counts 1, 4, and 6

Carranza challenges the sufficiency of the evidence supporting his convictions on one count of sexual penetration by a foreign object in violation of section 289,

subdivision (d) (count 1) and two counts of sexual battery by fraud in violation of section 243.4, subdivision (c) (counts 4 and 6). Carranza specifically claims that the evidence was insufficient to support a finding that he made any fraudulent representations to the victims in these counts about the purpose of his touching. We disagree.

In assessing a claim of insufficient evidence in a criminal case, "we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict–i.e., evidence that is reasonable, credible, and of solid value–such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] . . . [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 289, subdivision (d) prohibits any person from committing "an act of sexual penetration" if "the victim is at the time unconscious of the nature of the act and this is known to the person committing the act or causing the act to be committed." As used in this subdivision, a person is "unconscious of the nature of the act" if he or she "[w]as not aware, knowing, perceiving, or cognizant of the essential characteristics of the act due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose when it served no professional purpose." (§ 289, subd. (d)(4).) Section 243.4, subdivision (c) similarly prohibits any person from touching "an intimate part of another person for the purpose of sexual arousal, sexual gratification, or sexual

17

abuse" if "the victim is at the time unconscious of the nature of the act because the perpetrator fraudulently represented that the touching served a professional purpose."

Carranza asserts that there was insufficient evidence to support his convictions for sexual penetration and sexual battery by fraud because he did not expressly tell the victims that his touching of their intimate body parts was for treatment purposes. However, a similar argument was raised by the defendant and rejected by the appellate court in *People v. Pham* (2009) 180 Cal.App.4th 919 (*Pham*). The defendant in *Pham* was a chiropractor who was convicted of sexual battery by fraud for touching the intimate parts of his female patients while purporting to treat them. Like Carranza, he challenged the sufficiency of evidence supporting his convictions on the ground he did not expressly represent that his sexual touching served a professional purpose. (*Id*. at pp. 924-926.)

In rejecting such argument, the Court of Appeal in *Pham* reasoned as follows: "[The defendant] did not have to deceive his patients in such explicit terms to be guilty of fraudulent representation under . . . section 243.4, subdivision (c). The statute does not require an express representation; it simply speaks to the situation where the defendant 'fraudulently represented that the touching served a professional purpose.' [Citation.] In keeping with the statute's intent to criminalize sexual acts committed under the guise of professional services, it only makes sense to consider the totality of the defendant's conduct–not just his verbal statements–in determining whether he fraudulently represented the nature of his actions. After all, actions often speak louder than words: 'A false promise can as easily, perhaps more easily, be implied from conduct as from language. . . .' [Citation.]" (*Pham*, *supra*, 180 Cal.App.4th at p. 926.) Because the defendant used his position as a medical professional to disguise his lewd intentions and continued to give the appearance his actions were medically related during his treatment, his convictions were supported by substantial evidence. (*Id*. at pp. 927-928.)

In this case, there was ample evidence from which the jury reasonably could conclude that Carranza fraudulently represented to each of the victims that his improper touching served a professional purpose. Carranza held himself out to be a professional "sobrador," or massage therapist, who offered both physical treatment and natural

18

products for bodily health.  His office had a waiting room and a separate treatment room where customers were individually examined and treated by Carranza either on a massage table or mat.  Each of the victims in counts 1, 4, and 6 sought treatment from Carranza for a specific medical issue—Yolanda, the victim in count 1, for a uterine problem; Blanca, the victim in count 4, for lower back pain; and A., the victim in count 6, for back pain and menstrual issues.  While purporting to treat the women through massage therapy, Carranza inappropriately touched them on the breasts, buttocks, and/or vagina.  Although Carranza did not explicitly claim that his touching of their intimate body parts was for a professional purpose, the women clearly were induced to believe by his actions and comments that the touching was part of the treatment.

Considering the totality of the circumstances surrounding Carranza's treatment of each victim, the evidence was sufficient to support a finding that Carranza committed either a sexual penetration or a sexual battery through fraudulent representations.  Even without an express representation that the touching served a professional purpose, the jury reasonably could have inferred that Carranza misrepresented the true nature of his actions and misled the victims into believing that his inappropriate touching was part of his treatment.  Carranza's convictions on counts 1, 4, and 6 were therefore supported by substantial evidence.

### III.    Failure to Give a Unanimity Instruction

Carranza argues that the trial court had a sua sponte duty to instruct the jury that, before finding him guilty of the sexual battery charges in counts 3 through 9, the jurors had to agree unanimously on the act or acts which formed the basis of each conviction. Carranza asserts that a unanimity instruction was necessary because the jurors reasonably could have disagreed as to which intimate body part—breasts, buttocks, or vagina—was unlawfully touched by Carranza in treating each victim.  This argument lacks merit.

A jury verdict in a criminal case must be unanimous, and the jury must agree unanimously that the defendant is guilty of a specific crime.  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  "[W]hen the evidence suggests more than one discrete crime, either

19

the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*Ibid*.) This requirement of jury unanimity "'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Ibid*.) It typically applies to acts that could have been charged as separate offenses. (*People v. Maury* (2003) 30 Cal.4th 342, 423.) However, "[a] unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged. [Citation.]" (*Ibid*.) "'"[W]here the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place, the instruction is not necessary to the jury's understanding of the case."' [Citations.]" (*People v. Champion* (1995) 9 Cal.4th 879, 932.)

It is also well-established that a unanimity instruction is not required where the case falls within an exception for acts constituting a continuous course of conduct. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100; *People v. Crandell* (1988) 46 Cal.3d 833, 875; *People v. Diedrich* (1982) 31 Cal.3d 263, 282.) "The continuous course of conduct exception arises in two contexts. [Citations.] 'The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense. [Citation.] The second is when . . . the statute contemplates a continuous course of conduct of a series of acts over a period of time. [Citation.]' [Citation.]" (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 299.) The exception applies "when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz, supra,* at p. 100.)

The decision in *People v. Champion, supra*, 9 Cal.4th 879, is instructive on this issue. The victim in that case testified that the defendant committed two acts of rape. He raped the victim, left the room, and then returned a few minutes later to rape her again. (*Id*. at p. 932.) In rejecting the defendant's argument that the two separate acts required a unanimity instruction, the California Supreme Court noted that the defendant presented no evidence tending to show that he committed one of the rapes but not the other; rather,

his defense at trial was that he did not participate in any of the charge crimes. (*Ibid*.) The court accordingly concluded that, because "any juror believing that [the defendant] committed one of the two rapes testified to by [the victim] would inexorably believe that he also committed the other, the trial court did not err in failing to give a unanimity instruction." (*Ibid*.; see also *People v. McIntyre* (1981) 115 Cal.App.3d 899, 910 [two acts of oral copulation occurring within a matter of minutes were part of a single event for which no unanimity instruction was required].)

Here, the evidence at trial showed that Carranza touched each victim on multiple parts of the body during single treatment sessions. Each victim was inappropriately touched while receiving massage therapy in the back room of Carranza's office on one occasion. Carranza's touching of different intimate body parts, including the breasts, buttocks, and vagina, occurred within minutes of one another and were part of an uninterrupted sequence of movements as he purported to treat the victim. Additionally, Carranza's defense to each sexual battery count was essentially the same—that he touched the woman as part of his treatment and not for any specific sexual purpose. Under such circumstances, Carranza's acts of touching multiple intimate body parts while providing treatment were so closely connected in time and space as to form a single transaction. Because Carranza's actions constituted a continuous course of conduct as to each victim, the trial court did not err in failing to give a unanimity instruction.

**DISPOSITION**

The judgment is affirmed.


ZELON, J.

We concur:


PERLUSS, P. J.


SEGAL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.